[L. A. No. 7932.  In Bank.—April 4, 1925.]

In the Matter of the Estate of ANDREW HOLLOWAY, Deceased. CHRISTOBEL ELLA PARKER et al., Appellants, v. FRANK BRYSON, Admr., etc., Respondent.

[1] ESTATES OF DECEASED PERSONS—WILLS—EXECUTION—SIGNING.— The fact that another did the writing or guided the testator's hand in subscribing to his will because he was physically weak raises no presumption against the due execution of the will, as this is permitted by section 1276 of the Civil Code.

[2] ID.—WILL CONTEST—DIRECTING VERDICT.—In a will contest, where evidence was introduced bearing on all the elements of a due execution of the will and was sufficient to squarely present that issue of fact to the jury, the contestants offering no affirmative evidence, there was no conflict, and there was no error in directing the jury to find for the proponents on that issue.

[3] ID. — REQUEST TO WITNESS WILL. — The circumstance that a testator himself did not formulate the words of request that certain persons witness his will does not tend to prove that he was so lacking in testamentary capacity that he could not execute a will, and if his conduct indicated that he desired persons present at the time his name was subscribed to the will to witness the execution thereof and they officiated accordingly, this is sufficient.

---

1. As to whether hand guided by hand of another is the signature of testator to will, note, L. R. A. 1915D, 906.

[4] ID. — UNDUE INFLUENCE — PRESUMPTION. — It is only when the beneficiary has been active in the preparation or participated in the execution of a will that a presumption of undue influence arises. The presumption of such influence is not raised by proof of interest and opportunity or a confidential relation alone.

[5] ID.—EXTENT OF INFLUENCE—DESTRUCTION OF FREE AGENCY.—The kind of undue influence that will invalidate a will must be such as in effect destroyed the testator's free agency and overpowered his volition at the time of the making of the will.

[6] ID.—GENERAL INFLUENCE—PRESSURE UPON TESTAMENTARY ACT.— General influence not brought to bear directly upon the testamentary act, however strong or controlling, is not undue influence such as will afford ground for the setting aside of a will of a person of sound mind. There must be evidence, either direct or circumstantial, that pressure was brought to bear directly upon the testamentary act.

[7] ID.—MENTAL CAPACITY — SUPPORT OF FINDINGS — APPEAL.—In a will contest where, when all the testimony bearing on the issue of mental capacity is considered and weighed together, it cannot be held it is not sufficient as a matter of law to support a finding either way, the verdict of the jury that decedent at the time of the execution of the will admitted to probate had mental capacity to make it cannot be disturbed on appeal.

[8] ID.—MENTAL COMPETENCY—TEST.—A testator may have capacity to make a valid will, although not able to make contracts or manage his estate. He may not have sufficient mind and vigor of intellect to transact business generally, or to make and digest all the parts of a contract and yet be competent to direct the distribution of his property by will.

[9] ID.—EVIDENCE—TESTIMONY OF SUBSCRIBING WITNESSES.—The law presumes that a subscribing witness had his attention directed to and noted the mental capacity of the testator, therefore his opinion should be entitled to more weight than that of one who was merely passive, but the weight of such testimony is for the jury to determine.

6. Undue influence affecting or invalidating will, notes, 16 Am. Dec. 257; 31 Am. St. Rep. 670.

8. Testamentary and contractual capacity contrasted, note, Ann. Cas. 1915A, 362.

Testamentary capacity in general, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444. See, also, 28 R. C. L. 94.

9. Effect of testimony of subscribing witnesses opposing or supporting will, note, 77 Am. St. Rep. 459.

Effect of opinion of subscribing witness to will as to sanity or insanity of testator, note, 39 L. R. A. 715.

[10] ID.—DIRECTING VERDICT—INSUFFICIENCY OF EVIDENCE.—In a will contest it would be error to refuse to direct a verdict for the proponent of the will where there was no substantial evidence whatsoever tending to support any of the contentions made by the contestants.

[11] ID. — REVOCATION OF WILL — SECTION 1296, CIVIL CODE. — Under section 1296 of the Civil Code, a prior will is revoked by a subsequent will if the latter contains provisions wholly inconsistent with the terms of the former.

[12] ID.—PROBATE OF WILL—PRESUMPTION OF VALIDITY—INSTRUCTION —BURDEN OF PROOF.—In a will contest, an instruction to the effect that the fact that the will had been previously admitted to probate *prima facie* established such document as the will of the decedent and his competency to make a will, and that on the contest the law presumes that he was competent to make said will, and that the burden of proving that at the time of its execution the decedent was incompetent to execute a will is upon the contestants, and unless they sustain such burden by a preponderance of evidence, the verdict must be for the proponent of the will, is not open to the objection that it erroneously placed upon the contestants a greater burden of proof to overcome the presumption that the deceased was competent to make a will.

(1) 40 Cyc., p. 1104, n. 7.    (2) 40 Cyc., p. 1333, n. 63.    (3) 40 Cyc., p. 1115, n. 3.    (4) 40 Cyc., p. 1151, n. 97, p. 1152, n. 9, 11, p. 1153, n. 22.    (5) 40 Cyc., p. 1144, n. 53.    (6) 40 Cyc., p. 1145, n. 54.    (7) 40 Cyc., p. 1358, n. 75.    (8) 40 Cyc., p. 1007, n. 14, 15.    (9) 40 Cyc., p. 1035, n. 29, p. 1036, n. 31.    (10) 40 Cyc., p. 1333, n. 62.    (11) 40 Cyc., p. 1173, n. 62.    (12) 40 Cyc., p. 1339, n. 5.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Affirmed.

The facts are stated in the opinion of the court.

Davis, Rush & MacDonald and Wm. B. Beirne for Appellants.

Waldo & Hinds and Lawler & Degnan for Respondent.

LAWLOR, J.—On November 20, 1917, Andrew Holloway died at his home in Pasadena at the age of forty-five years, leaving a last will and testament as follows: "I, Andrew Holloway, of the City of Pasadena, County of Los Angeles, State of California, being of sound and disposing mind and memory do make, publish and declare this my last will and

testament. I direct that after my business is settled and my debts paid that all my property, both real and personal, of which I may be possessed shall go to my wife, Annie. I hereby revoke all former wills by me made, and appoint my said wife to be the executrix of this my last will and testament without bond. In witness whereof I have hereunto set ' my hand and seal this 4th day of November, 1917. Andrew Holloway. Subscribed,. sealed, published and declared by the above-named Andrew Holloway as and for his last will and testament in our presence and in the presence of each other have subscribed our names as witnesses thereto at the request of the said testator this 4th day of November, 1917. Nita J. Wright, address, 276 North Lake avenue, Pasadena. Mineita E. Binkley, address, 350 North Pasadena avenue, Pasadena, Cal." Indorsed on the back, "No. 37,223, will of Andrew Holloway, filed November 27, 1917. H. J. Leland, Clerk, by H. H. Doyle, Deputy." On December 11, 1917, this will was admitted to probate and letters testamentary were issued to Annie M. Holloway, the executrix therein named, who duly qualified as such executrix. On April 18, 1918, Frances Ellen Parker and Emma Jane Holloway, as contestants, filed a petition wherein the validity of the will is contested on several grounds and praying the revocation of the probate thereof. The petition is based, first, on the ground that the "said instrument purporting to be the last Will and Testament of the said Andrew Holloway deceased was not executed in the manner or form required by law in this: that the said purported Will was not signed by the said Andrew Holloway in the presence of the purported subscribing witnesses thereto; that the names of said purported subscribing witnesses. to said last will were not signed; nor were either of them signed thereto by the said witnesses respectively, at the request of the said Andrew Holloway, or in his presence; that the said Andrew Holloway did not declare the same to be his Will in the presence of said witnesses, or either of them, or at all"; second, that the testator was not at the time and long prior thereto of sound and disposing mind, and third, that he was not acting of his own free will or volition but was unduly influenced at the time by his wife, Annie M. Holloway, and Nita J. Wright.

Six questions were submitted to the jury with instructions to answer the first four in the affirmative and the fifth in the negative. The questions are as follows: "Did Andrew Holloway by words or conduct, indicate to Mineita Binkley his desire that the latter sign his name to the will which has been admitted to probate? 2. Were Nita J. Wright and Mineita Binkley present at the time Andrew Holloway's name was subscribed to said will? 3. Did Andrew Holloway, by words or conduct indicate to Nita J. Wright and Mineita Binkley that said instrument was his will, and that he wished them to sign the same as witnesses? 4. Did Nita J. Wright and Mineita Binkley sign said will in the presence of said Andrew Holloway, and in the presence of each other? 5. Was Andrew Holloway procured to make said will by undue influence of Annie M. Holloway and Nita J. Wright or either of them? 6. Was Andrew Holloway, at the time said will was made, of sound mind (as the same is defined in the instructions of the Court)?" Upon the last question the jury also found in the affirmative and judgment against the contestants and plaintiffs for costs of the suit was ordered to be entered. Contestants interposed a motion for a new trial, which was denied.

The contestants in taking this appeal specify eight grounds of error, which we will discuss in the order of their presentation, and in reviewing the evidence under each of the eight specifications we will interpret it in the light of the rule that all presumptions and intendments are in favor of the action of the court below.

1. The first assignment of error is that the purported will was not signed by the deceased, and that the subscribing witnesses were not present at the time the deceased's name was subscribed to the will. The evidence on this question is uncontradicted. Testimony was given by Annie M. Holloway, the widow, by Mineita E. Binkley, a nurse, by Mrs. Nita J. Wright, a Christian Science practitioner, and by the attorney, Samuel S. Hinds.

It was testified by the nurse that on the morning of November 4th the deceased appeared to want someone and his wife finally decided it was Mrs. Wright, who was called on the telephone, and came between 11 and 12 o'clock that morning; that Mrs. Wright told the nurse to get a piece of paper and take down what the deceased had to say; that the nurse got the paper and pencil and knelt beside the bed

and asked him if he had something he wanted her to write down and he said "yes"; that he said, "After the business is settled, all that is left is to go to my little Annie"; that after she wrote it down she read it to him and asked if that was all and he answered "yes"; that his hands were not capable of holding the pen and she put the pencil in his hand and helped him write his name; that Samuel S. Hinds, the attorney, was called; he came shortly afterward and read the words she had written; that he asked about the reference to "my little Annie" and suggested that the word "little" be erased and the word "wife" inserted instead; that she did as he suggested and later changed the word back to "little"; that Mr. Hinds took the "pencil will" and went to his office; that he returned; in the presence of the witness and Mrs. Wright he read it to deceased and asked him if that was that he wanted and deceased answered "Most assuredly"; and that "Mr. Hinds asked Mr. Holloway if he would like to sign this and he said he would, and I remember we raised him up in the bed and he was held up with pillows; I don't know whether Mrs. Holloway held the pillow at his back, while I took the pen that Mr. Hinds took from his pocket, his fountain pen, I think, and put it in Mr. Holloway's hand and helped him the same as I had at the former signing. I think I explained to Mr. Hinds that Mr. Holloway could not hold anything in his hands and that I would have to help him. We put this paper on a book or magazine or something and put it in front of him and I held his hand with the pen in it while the name was signed." She also testified that while the attorney read the will to deceased she stood on one side of him and Mrs. Wright on the other.

Mrs. Nita J. Wright testified that "When Mr. Hinds returned he came into the room and he again spoke to Mr. Holloway; Mr. Holloway recognized him and he said, 'Now, Andy, I am going to read this paper to you. You understand that this is your will?' and he asked Miss Binkley and I to look over, each one of us, over each shoulder, and to read with him as he read this aloud. After he read this paper he said to Mr. Holloway, 'Now, Andy, you understand this is your last will, and is this what you want done?' Mr. Holloway said, 'Most assuredly; it is what I have always wanted,' or, 'what I have wanted.' . . . Mr. Hinds, after

the reading of the paper at that time, asked Mr. Holloway again if he wished Miss Binkley and I to witness, which we did. We had to raise him slightly somewhat in the bed; then instead of putting the pillow back we raised him up, and then Miss Binkley, as I remember, Mr. Hinds offered him a pen or pencil and Miss Binkley said, 'He can't hold it in his hand, I will have to guide his hand,' and then . . . she put her fingers around his hand and guided his hand while he wrote his name. To my recollection the name 'Andrew Holloway' as it appears in the instrument was written at that time. . . . Mr. Hinds asked if he wished Miss Binkley and I to witness, which we did, we went over to this same table and again signed. . . . We then signed it in the room."

Samuel S. Hinds testified that on November 3, 1917, he received a telephone call from Mrs. Holloway and in response thereto went to her home; that he received another call the next day at about noon and went to the house and into the room of deceased; that Mrs. Nita J. Wright and Miss Binkley and Mrs. Holloway were also present; that deceased was sitting on the side of the bed; that Miss Binkley handed him "the so-called pencil will" and said, "Mr. Holloway has just dictated these words"; that he took the paper and asked who is "Little Annie" and Miss Binkley said "Mrs. Holloway"; that he advised the nurse to erase the word "little" and write in the word "wife" and immediately afterward changed his mind and told her to rewrite the word "little"; that he wrote in the date, "November 4, 1917" at the top; and "I said, 'Andy, this will that you have just made, you understand what it is?' and he nodded his head, and I said, 'This will leaves all of your property to your wife; is that what you want to do?' And he nodded his head and spoke the word 'Yes,' he answered in the affirmative, in either one of those ways—I don't know which it was, and I said, 'It will be necessary to have two witnesses on this will. Do you want Mrs. Wright and Miss Binkley to act as witnesses?' and he answered in the affirmative. I then wrote out the attestation clause, pen and ink, and Mrs. Wright and Miss Binkley signed as witnesses in the presence of Mr. Holloway and in the presence of each other"; that he took the paper and went to his office and wrote it out on the typewriter after asking an attorney whose offices adjoined his own the exact wording of the wit-

ness clause; that he returned to the Holloway residence immediately and greeted the deceased and said, " 'Now, Andy, I have rewritten this will.' I said, 'I am going to read it to you and see if it expresses your wishes'—words to that effect. I explained to him that I had named his wife as executrix of the will; I told him I was going to read it to him, and for him to listen; I asked Mrs. Wright and Miss Binkley to watch as I read; I then read it over slowly, clearly, looking up occasionally, and Mr. Holloway nodded his head several times. After doing that I asked Mr. Holloway if he wanted to sign the will, and he said 'Yes.' To the best of my recollection, I took my fountain pen out of my pocket, held it toward him, his hand was lying on the covers; he moved it slightly; Miss Binkley then said, 'Mr. Holloway is unable to use his hands; I will have to help him in signing.' That circumstance is very clearly impressed on my mind, because it was the first intimation I had that Mr. Holloway hadn't signed the other instrument. . . . Miss Binkley took the pen, placed it between his fingers—I think a book was brought or something to afford a flat writing surface, and the name of Andrew Holloway was written. After that had been done—I neglected to mention one thing, after reading this over I said, 'Now, Andy, you understand this is—you understand what this is, this is a will in which you leave all your property to your wife?' and he spoke these words, 'Most assuredly I do; that is what I have always wanted to do.' He spoke them slowly, but distinctly. I didn't have to ask him to repeat them, they were unmistakable. After the signature had been affixed I said to him, 'It will be necessary to have witnesses to this will.' I said, 'Is it your desire that Mrs. Wright and Miss Binkley should sign as witnesses?' and he answered in the affirmative. . . . The witnesses, Mrs. Wright and Miss Binkley, then signed in the presence of Mr. Holloway, . . . and in the presence of each other.''

This evidence is corroborated even as to minor details by the widow of deceased and the Christian Science practitioner.

The contestants argue that ''at its best the so-called signature was an attempt to have the writing appear to be the signature of the deceased . . . there is no evidence that he requested anyone to sign the purported will for him.''

Section 1276 of the Civil Code, subdivision 1, concerning the execution of a will, declares that ''It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto.'' Subdivision 2 is as follows: ''The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority.''

[1] It is clearly shown by the testimony above recited that the will was properly subscribed in the presence of the attesting witnesses and at the request of the testator. The fact that another person did the writing or guided the testator's hand because he was physically weak comes within the provisions of section 1276 of the Civil Code, and raises no presumption against the due execution of the will. (*Estate of Guilfoyle,* 96 Cal. 598 [22 L. R. A. 370, 31 Pac. 553].) In the case of *Estate of Latour,* 140 Cal. 414 [73 Pac. 1070, 74 Pac. 441], the testator was so enfeebled by sickness at the time of the execution of the will that he·was unable to communicate except by signs in answer to questions, and the court held that this fact was not sufficient to shift to the proponent of the will the burden of proof as to the mental capacity of the testator. The question is not whether the testator himself, or another person at his request, signed the will at the end thereof, but whether the testator had sufficient understanding to direct the disposition of his property. This question, we assume, has particular reference to the physical capacity of the testator, and under another head we will discuss his mental capacity.

[2] Evidence was introduced bearing on all the elements of a due execution of the will and was sufficient to squarely present that issue of fact to the jury, and the contestants offering no affirmative evidence, there was no conflict; and the evidence being sufficient as matter of law, it cannot be said the court erred in directing the jury to find for the proponent on the issue we are considering.

2. The second assignment of error is that there is not sufficient evidence that the subscribing witnesses signed the purported will in the presence of the deceased. Contestants did not offer any testimony that at the time the deceased's name was subscribed to the will the subscribing witnesses were not present. As shown under the first assignment of

error, the evidence was uncontradicted that both subscribing witnesses were present at the time the testator's name was subscribed to the will; that his conduct indicated he desired them to witness the execution, and that they then officiated accordingly. The question whether the testator at the time of the execution of the will had testamentary capacity, whether his physical condition so affected his mind that he was not aware of anything that passed between himself, the attorney and the witnesses, and did not comprehend what was being done, will be discussed under the fourth assignment of error. [3] From the authorities cited under the first assignment of error, and others, the mere circumstance that the testator himself did not formulate the words of request does not tend to prove that he was so lacking in testamentary capacity that he could not execute a will. It was held in *Estate of Mullin*, 110 Cal. 252 [42 Pac. 645], that if the attorney asks a question as to whether the testator wishes certain persons, in whose presence he has signed his will, to witness the execution, and the testator in response thereto answers "yes," this is a sufficient request for such person to witness the will. (See, also, *Estate of Johnson*, 152 Cal. 778 [93 Pac. 1015].)

3. This assignment of error is that even if it be concluded that the will admitted to probate was duly executed, nevertheless the deceased was procured to make the will by the undue influence of his wife, the nurse, the Christian Scientist, and the attorney, Samuel S. Hinds.

The contestants urge that the evidence shows that' undue influence was brought to bear upon the testator on November 4, 1917, at the time the will was executed; that in February, 1913, the deceased made a will without suggestion from anyone, and in June, 1916, after his attitude changed toward his brother Arthur, he went to the office of his attorney, Victor L. Ward, and told him he wanted to change his will; that in both the prior wills he did not name his wife as executrix, but named his attorney, Victor L. Ward; that the will of 1916 is a "formidable document," containing many clauses and worded in a formal and businesslike manner as contrasted with the purported will admitted to probate; that he at no time mentioned the other attorney, Samuel S. Hinds; that in 1917 he told his sister, Mrs. Ethel Parker, that he had remembered her in his will;

that she had befriended him when he arrived here from England; that he had an aged mother and a sister who cared for her, in England, for whom he had made provision in the prior wills; that the wife, Nita J. Wright, and Samuel S. Hinds were affiliated with the Christian Science Church "and no doubt each shared in the teaching of the church as described by Mrs. Wright in her cross-examination and therefore could not admit that the deceased was unconscious from the standpoint of their faith"; that "it can be fairly inferred from the evidence that the defendant and Mrs. Wright planned this will some time before the deceased's last illness; that the wife called Samuel S. Hinds before the will was made and talked with him and that he did not see the deceased before the will was made."

It is true that the deceased had previously made a will in which the contestants were mentioned, but the evidence is ample to sustain an inference that between the time that will was made and his last illness he had suffered financial reverses and was planning some change in the disposition of his estate.

William C. Baker, who knew the deceased for a number of years, testified that he met him at a club to which they both belonged; that he had a brief conversation with him during the month of August, 1917, two or three months before he died; that he spoke of his illness and that he worried about his contracts and losses and then told him he had made enough money to take care of his wife "and that is sufficient. . . . It is a great comfort to me."

Miss Floy Burdick, the stenographer and bookkeeper in the office of deceased, testified that he had suffered heavy losses and worried a great deal; that she talked to him in October or November, 1916, when he said he must change his will and have everything go to his wife; that about six weeks before his death he told her if he should die suddenly she was to take certain books to the office of Victor L. Ward, who had drawn his previous wills, and say to him: "I know that these papers are in your hands because I want Annie well provided for."

Mrs. Rose Bryant, whose husband was associated with deceased in business, testified that deceased, who was worried about his business, asked her how her husband, before his death, had arranged his affairs. She told him that every-

195 Cal.—46

thing was left in her name and the deceased "expressed himself as desiring to do something of that kind. . . . He repeated it a good many times. Just a few days after that he went back to Pasadena just before his death."

A. E. Austin, a general contractor, who did business with deceased, testified that deceased, in his presence, asked Mrs. Rose Bryant how Mr. Bryant had left his affairs, and remarked that he wished he could do the same.

This evidence is sufficient, as we have indicated, to support an inference that the deceased had formed an intention to make a change in the disposition of his estate.

With respect to the contention that the change of attorneys tended to support the claim of undue influence, Victor L. Ward, who was his general attorney, testified that he had drawn a will for him on June 2, 1916; that he did not know that Mrs. Holloway had tried to get in touch with him during deceased's last illness; that he had a telephone at his office in Pasadena and one at his residence; that the only time he was away was when he went to Bakersfield and returned November 14th, after having been away a little over twenty-four hours; that he was in and about his office during office hours on business days from October 20th to November 13th, except that he may have been in Los Angeles at court.

The wife of the deceased testified that before Samuel S. Hinds came she "several times endeavored to communicate with Mr. Ward. . . . I saw Mr. Ward on Monday following October 25. . . . I told Mr. Ward I had been trying to get him for some time and was unable and he said, 'I just returned from Bakersfield and I heard Mr. Holloway was ill and came out.' I said I had tried several times to get him and he said, 'I can't be in a dozen places at once.' "

T. H. Parker, the husband of Ellen Parker, a sister of deceased, testified that after the death of deceased he went to visit Mrs. Holloway and asked her why Victor L. Ward as attorney did not draw up the will, and Mrs. Holloway said she tried to get him but could not, so she got Samuel S. Hinds.

It also appeared that Samuel S. Hinds was a friend of the deceased and belonged to the same club and church. Mrs. Holloway further testified that she "called him because I felt I would like to have some one to speak to that I could

trust"; that Mrs. Wright did not suggest that she call him but that they went over the list of attorneys and finally decided upon him, and that at the meeting with him prior to November 4th she did not discuss the subject of the will of deceased.

Concerning the question of undue influence claimed to have been exercised by the Christian Science practitioner the testimony is that she had known deceased about four years and treated both him and his wife; also that she had treated him at his request during the last six months of his life; that on November 4th there had been some conversation with the nurse about the deceased wanting to see a Mr. "Rice," but as the sequel showed he meant Mrs. "Wright," who was called by Mrs. Holloway and asked to come and she came in half an hour, the deceased greeting her; she sat by the side of the bed and finally asked him what was troubling him; that he answered it was not his business or the work in Ventura but that he was worrying about "little Annie" and that he wanted to make a will—Mrs. Wright called the nurse, the pencil will above mentioned was written; that she advised Mrs. Holloway to call a lawyer and Samuel S. Hinds was summoned; he came shortly afterward. Mrs. Holloway testified that she never had any conversation with Mrs. Wright in reference to enlisting the services of Samuel S. Hinds to make a will and that no word was spoken to Mrs. Wright, either before she arrived or before the nurse spoke, about the deceased wanting to see someone about a will.

There is no evidence that the beneficiary, the widow of the deceased, was active in any way in the preparation of the will. Mrs. Wright was the first to ascertain that the deceased desired to make his will. She thereupon advised the widow to call an attorney and the nurse got paper and wrote the pencil will. [4] It is only when a beneficiary has been active in the preparation or participated in the execution of a will that a presumption of undue influence arises. The presumption of such influence is not raised by proof of interest and opportunity or a confidential relation alone. (*Estate of Relph,* 192 Cal. 451 [221 Pac. 361].)

There is no evidence to show that the nurse influenced the deceased in the making of the will. Miss Binkley arrived on October 30th and prior to that time had never seen de-

ceased nor did she have any acquaintance with Mrs. Holloway before the last illness of deceased. The only attempt made by contestants to impeach the testimony of proponent's witnesses is found in the testimony of N. P. Moerdyke that Miss Binkley had told him after the death of deceased he was in a state of torpor prior to November 4th; that he tried to make her understand he wanted to make a will; that she was alone with him when he dictated the notes from which Samuel S. Hinds drafted the will and that but one document was signed on that date. Miss Binkley denied this conversation.

There is nothing in the record to show undue influence on the part of any of the persons named by the contestants.

[5] The kind of undue influence that will invalidate a will must be such as in effect destroyed the testator's free agency and overpowered his volition at the time of the making of the will. (*Estate of Motz,* 136 Cal. 558 [69 Pac. 294]; *Estate of De Laveaga,* 165 Cal. 607 [133 Pac. 307]; *Estate of Ingram,* 1 Cof. Prob. Dec. 222.)

[6] General influence not brought to bear directly upon the testamentary act, however strong or controlling, is not undue influence such as will afford ground for the setting aside of a will of a person of sound mind. There must be evidence, either direct or circumstantial, that pressure was brought to bear directly upon the testamentary act. (*Estate of McDevitt,* 95 Cal. 17 [30 Pac. 101].)

In order to invalidate a will on the ground of undue influence, mere evidence that the persons alleged to have exercised such influence had the opportunity to do so and might have done so if they had been so disposed and had possessed such influence, is insufficient. "The undue influence must actually exist, it must be actually exerted and it must be so exerted as to affect the terms of the will." (*Estate of Purcell,* 164 Cal. 300 [128 Pac. 932].)

In *Estate of Bryson,* 191 Cal. 521, at page 541 [217 Pac. 525, 533], it was said: " 'In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will which he executes is not the expression of his own desires.' (*Estate of Calkins,* 112 Cal. 296 [44 Pac. 577].) 'The presumption of undue influence is not raised

by proof of interest and opportunity alone. In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made.' (*Estate of Langford*, 108 Cal. 608 [41 Pac. 701].) It may be stated that so far as opportunity is concerned, any one of the heirs of the testatrix had equal opportunity to visit with, consult and advise with testatrix. We entertain no doubt that Isaac H. Bryson advised with his mother fully on both business and personal matters and on subjects affecting the present and future welfare of the family. This was not only his privilege but his duty. Unpleasant as well as pleasant matters were no doubt the subject of consideration. Proof to establish undue influence must be had of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made. (*Estate of Carithers*, 156 Cal. 422 [105 Pac. 127].) It consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it, some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment (*Estate of Kilborn*, 162 Cal. 11 [120 Pac. 762])."

We do not think that the evidence we have summarized is sufficient to justify an inference of undue influence which would invalidate the will. The fact that a new attorney was called in to prepare the will, in the absence of other circumstances, would not sustain an inference of undue influence; the presumption that the widow, who occupied a confidential relation with deceased, exercised undue influence upon him to induce a will in her favor does not arise, because she is not shown to have been active in the actual preparation of the will other than by summoning Mrs. Wright and Samuel S. Hinds; the evidence further shows that the deceased's sister and her daughters were at his home during his last illness and had an equal opportunity to visit, consult, and advise with the testator; the two subscribing witnesses, the nurse and the Christian Science practitioner, are not beneficiaries under the will and no reason is suggested as to why they would aid the wife in obtaining a will in her favor;

the nurse was a stranger to both the deceased and his wife, and the practitioner, while an old acquaintance of the family and a member of the same church, was engaged in professional services for which she received compensation; the testimony that deceased had suffered financial reverses and upon several occasions indicated his desire to make a will in favor of his wife without any other showing precludes an inference that the testamentary act did not comport with his intentions and the exercise of his free will. By this we do not mean that his declarations prior to making the will are evidence of his testamentary act, but such declarations do tend to show that the will which was admitted to probate coincided with his declared intentions concerning his wife. The deceased and his wife were shown to have been unusually attentive to and considerate of each other, and while it is not shown that deceased was on unfriendly terms with his sisters, the contestants, there is evidence that the deceased in discussing with Mrs. Edna Simons the circumstances that he did not want it known he was going to build a home said: "I don't want my sister to know . . . because she is jealous of what Annie has." In view of his financial losses it was natural that he should have desired to make provision for his wife in preference to his relatives. The circumstances that the deceased had gone to the office of his attorney in order to make his will in 1916, that the document then drawn up provided for the contestants as well as his wife, and that the wife was not named executrix therein, do not, in face of all the evidence, tend to support an inference that the dissimilarity in the two wills rendered the will admitted to probate invalid. With reference to the point that the deceased went to his attorney's office to execute his former will, it is sufficient to suggest that when the last will was executed he was unable to leave his home, for at that time he was very ill and was under the care of physicians and a nurse; every effort was made to keep business affairs from engaging his attention because of the effect of worry upon his physical condition. We perceive no warrant for the inference sought to be drawn by contestants from the circumstance that the last will failed to reflect the deceased's habitual method of formally preparing a document as shown, for instance, by his former will. The intent of the testator being sufficiently indicated by his last will

and there being no evidence of undue influence the form the will assumed is without significance. We therefore conclude that the will admitted to probate represented the testamentary act of the deceased.

The jury, therefore, was properly instructed to answer the fifth question in the negative. Even if the jury believed all the evidence of the witnesses for the contestants, they must have found for the proponent on this question, for it was insufficient as matter of law to establish undue influence.

4. This specification of error is that the deceased was not of sound and disposing mind at the time the will was executed.

It appears that Andrew Holloway was engaged in the street contracting business and for a year prior to his death he spent one-third of his time at Oxnard, where he was engaged on a road contract. During the summer of 1917 he was ill much of the time and for ten days prior to October 24th he and his wife had been at Oxnard; he was ill about half the time. He suffered from stomach trouble and hiccoughs and the doctors testified that the disease was cirrhosis of the liver caused by overindulgence in alcoholic drink. On October 24, 1917, accompanied by his wife and Miss Floy Burdick, his secretary, the deceased drove from Oxnard to Pasadena, where he had his home. The automobile had a leaking radiator and part of the distance he drove in the dark, as the automobile was not equipped with lights. Before getting out of the automobile upon reaching Pasadena the deceased was exhausted and fatigued and he cried. On the next day he had recovered sufficiently to go to town about 4 or 5 in the afternoon and on the following day he stayed home all day on account of illness. This condition continued for several days and finally, on October 29th, a doctor was called, who diagnosed the case as acute indigestion. A prescription was given and the deceased "went into a drowsy stupor" after an opiate was given him. On October 30th another doctor was called and a nurse came to assist in caring for the deceased. On November 1st he signed a check for the pay-roll in his business and on the next day his wife and Miss Floy Burdick went to Oxnard to pay the help. Various persons came in to see him and several doctors were in attendance. The first physician

called was Dr. Holcomb, who came before daylight on October 29th and gave the patient opiates. On the same day Dr. E. S. Rosenberger, a druggist and a friend of the family, brought some medicine; Dr. Holcomb called again. Something was said about calling in another doctor and a nurse and on October 30th Dr. G. E. Campbell came and the nurse, Miss Binkley, appeared the same evening. Dr. Campbell called at least once a day and sometimes twice a day and the nurse remained until the death of deceased. The deceased's wife testified that on October 31st she thought he was still under the influence of the opiate that Dr. Holcomb gave him; that he was not unconscious on the day Dr. Campbell came; that he spoke to the nurse; that he was so ill he was disinclined to talk; that about two weeks later a consultation was held and Dr. A. J. Crance was called in; that the patient drank water and liquids out of a glass tube because it was hard work for those present to lift him up every time he wanted a drink; that he never lost the use of his hands entirely and could raise them; that he knew what was going on although he did not give any sign; that there never was a time when he could not speak; that he was so ill he did not want to; that she did not notice that he had any difficulty in articulating because it was habitual for him to hesitate before speaking; that he only asked for what he needed; that he kept his eyes closed because of the strong light; that he sang hymns; that the phonograph was brought to his room and that he occasionally sang hymns up to within a week before his death; that on November 3d he talked about the work in Ventura and asked the nurse when she thought he would be able to attend to things.

Mrs. Nita J. Wright testified that on the day the will was signed the deceased was rational; that when the nurse gave him a drink he thanked her, and that "it was a normal attitude"; that after the will was made she called again; he indicated some flowers that Mr. Hinds had sent; he said he had not seen anything more beautiful, and remarked that Mr. Hinds had sent them; that he was always of slow speech; that he was a reticent man; that physically he was abnormal but mentally he was normal.

Mineita E. Binkley, the nurse who was called during the last illness of deceased, testified that he suffered from pain;

that she had no special conversation with him, but asked him to take his medicine, and he complied; that he asked for a drink of water; that there were times when he was apparently sleeping and then there were times each day when he was quite bright; the light troubled his eyes and he kept them closed most of the time; that he asked her to telephone for someone on November 2d, but she could not find the right one; that he called Margery Lisco by name and talked naturally to her and her mother, Mary Lisco; that he would ask her if he was getting better; that upon one occasion he said he did not want to see his brother, George Holloway; that he spoke to Mr. Hinds and said, "Hello, Sam"; that when Mr. Simons came to see him an evening paper was in the room and the deceased said, "Hello, Walter, what is the latest war news?"

H. F. Messer, a druggist and brother-in-law of deceased, · testified that the deceased and his wife were very affectionate and pleasant with each other; that he called to see deceased and tried to cheer him up; that he would answer "no" by shaking his head; that he knew him and knew what he was doing; and when he did converse he was rational; that he did not talk much at any time—"He was always a quiet man and not given much to talk."

Mrs. H. F. Messer, the wife of the above witness, corroborated his testimony about the conversations with deceased; that he sang with his wife and appeared to enjoy the phonograph music when it was played and he accompanied the music; that he did not talk very much at any time, either when he was well or sick.

Walter Simons, who was intimately connected with deceased for a great number of years, testified that when he visited and greeted him he roused up and said, "Hello, boy," and that he appeared to be in the exhausted condition that sick people usually are; that he saw deceased on the evening Dr. Campbell and Dr. Crance held the consultation; that he was propped up in bed and that his eyes were fixed partly open; that he thought he heard the death rattle in his throat and told Mrs. Holloway that he was dying.

Mrs. Mary Lisco testified that when she occasionally saw him he was very ill and nauseated, and suffered intensely; that several days after the nurse came she visited him, and when Mrs. Holloway asked deceased if he knew Mrs. Lisco

he said, "Most assuredly I do"; that the deceased did not speak to anyone, the nurse, the doctors, or to her, and that she thought he was resting because he was very ill; and that she did not try to talk to him, thinking it best not to talk in a sick room; and that deceased repeated the Ninety-first Psalm as his wife read it.

Samuel S. Hinds testified that at the time the will was made and executed he thought the deceased was a very sick man and probably very near the end; that he did not know from what disease he was suffering and that he acted upon the assumption that the deceased was rational at all times. He stated, "I did not ask him whether he remembered what property he owned. I made no inquiry as to whether he remembered his relatives or friends, or whether he had any children, or whether he had been married before. I made no investigation at all with express purpose to ascertain whether or not his illness had progressed to that point where it affected his mind. . . . I don't think his mind at that time was in such a condition to have comprehended all the intricacies of a contract for street improvements understandingly. The will—it seemed to me was a very simple proposition and I think he was able to comprehend that. There were no complications." He also testified that on November 13th he prepared a power of attorney in favor of his wife and explained to the deceased the necessity of it; asked him if it was his desire to sign it, and he said, "Yes"; that Miss Binkley again guided his hand in signing it; that the deceased at the time repeatedly attempted to tell him about something but was interrupted by a fit of hiccoughing and that he told him he must keep quiet.

Contestants called the following witnesses:

Mrs. Ellen Parker, a sister of deceased, testified that on November 6th, when she came to see deceased, Mrs. Holloway told her not to try to talk to him, that he would not know her; that he drank out of a straw and made bubbles in the glass; that his eyes were partly opened; that he did not answer and took no notice of her; that the nurse said his system was poisoned and it had affected his brain; that she went again on November 14th and the nurse was feeding him with a spoon; that he took no notice of her and repeated just what she said to him; that on November 17th she came again, but he did not speak to her and that Mrs.

Holloway told her he was sleeping; that she saw him at various times up to his death and he did not recognize her; that he had no use of his arms or limbs and only moved one leg.

Ethel Parker and Christobel Parker, two nieces of the deceased, both testified that when they saw him they could not tell whether he was sleeping or resting.

Dr. E. S. Rosenberger, an intimate friend of the deceased, testified that he was ill about a year before he died and that during the last two months of his life he was quite sick; that on October 29th when he saw him, he did not recognize him; that he was in a stupor, and although he tried to, he did not have any conversation with him; that on November 1st, when William Rogers and he went to the room of deceased to get the check signed, the deceased was not of sound mind, could not take care of his business, was "practically unconscious," and could not write, and gave no sign that he understood the purpose of the check when it was explained to him.

William Rogers, an intimate friend of the deceased for twenty years, testified that Mrs. Holloway told him the deceased was ill; that he went to see him, and upon greeting him, the deceased said he was a very sick man; that on November 1st, when the check for the pay-roll was signed, the deceased was not in such a mental condition that he could take care of himself or of his property; "that he was in a sleepy condition and his eyes were closed, and he did not appear to be—he appeared to be asleep, showed no signs of intelligence, and I should say that he was not conscious of what was going on."

George Holloway, a senior brother, testified that he was always on friendly terms with deceased; that deceased drank alcoholic liquor to excess and was very ill the last year of his life; that on November 2d, he went to see deceased and was not allowed to see him because deceased would not recognize him; that he returned on the 6th or 7th of November and that the deceased did not recognize him; that he mumbled something and his eyes were closed; that he moved his head a little when Mrs. Holloway put her hands on his head; that he saw him again on November 19th and deceased did not at that time know anything, he was breathing hard and his eyes, partly open, were set on

the ceiling; that he was not of sound mind because he did not talk.

Dr. H. C. Brainard, who qualified as an expert mental and nervous disease specialist, in an answer to a hypothetical question relating to the life history of deceased and the facts concerning his last illness as testified to by the witnesses, declared that in his opinion the deceased was not of sound mind during the period from November 1st to the date of his death, November 20th; that "it was evidently a case of cirrhosis, a history of chronic liver disease in its terminal stage, in which stupor is a very common and usual accompaniment, and that stupor apparently began the first of November, or that by a few days, and continued to his death."

Dr. William M. Lewis, another expert, gave a similar opinion as to deceased's mental condition.

[7] When all the testimony bearing on the issue of mental capacity is considered and weighed together it cannot be held it is not sufficient as matter of law to support a finding either way, and hence the verdict of the jury that decedent at the time of the execution of the will admitted to probate had mental capacity to make it cannot be disturbed. There is no pretense that the testator was delirious, irrational, or insane or under any delusions, but merely that he was in such a state of bodily weakness as to be peculiarly susceptible to suggestion and that the nature of the disease from which he was suffering affected his mind to such a degree that he was incapable of an intelligent disposition of his property. It is not claimed that he was subject to mental aberrations. More particularly, the contestants contend that "The slowness of speech was due to the condition of his brain," but all the testimony shows that the deceased was a reticent man and habitually very quiet. It is true the expert physicians who answered hypothetical questions said the fact that deceased repeated the Lord's Prayer and sang songs and hymns was mere mechanical repetition and the contestants contend from this that the deceased's brain was affected by the poison in his system. However, the attorney, Samuel S. Hinds, testified he thought the deceased was able to comprehend the will at the time it was executed but that he did not think he could have comprehended all the intricacies of a contract for street im-

provement.   The law does not require the same degree of
capacity to make a will as is required to execute any other
legal instrument.   [8]   "A testator may have capacity to
make a valid will, although not able to make contracts or
manage his estate.   He may not have sufficient mind and
vigor of intellect to transact business generally, or to make
and digest all the parts of a contract and yet be competent
to direct the distribution of his property by will."   (1 Alex-
ander's Commentaries on Wills, p. 444.)

There is no claim that the testimony of the various wit-
nesses, subscribing, lay, or expert, was improperly admitted
or that it is not sufficient as matter of law to sustain the
verdict on that issue.   It is contended, however, that the
opinion of lay witnesses as to the condition of mind of the
deceased is a mere conclusion and not supported by their
statements as to his condition.   (*Estate of Russell,* 189 Cal.
759 [210 Pac. 249].)   [9]   The testimony of the subscrib-
ing witnesses is unequivocal.   "The law presumes that a sub-
scribing witness had his attention directed to and noted the
mental capacity of the testator, therefore his opinion should
be entitled to more weight than that of one who was merely
passive."   (1 Alexander's Commentaries on Wills, p. 515.)
Of course, the weight of such testimony is for the jury to
determine.

It was said in *Estate of Casarotti,* 184 Cal. 73 [192 Pac.
1085] : "It must be borne in mind that it is not every weak-
ness and impairment of the faculties of the testator that will
invalidate a will.   Even where a testator is feeble in health,
suffering under disease, and aged and infirm, yet if he was
of sufficiently sound mind to be capable of understanding
the nature and situation of his property, and of disposing
thereof intelligently, without any delusions affecting his ac-
tion, he had sufficient capacity to make a will. . . . [Citing
authorities.]   It was held that the fact of the testator being
unable to speak articulately and was compelled to communi-
cate by signs did not raise a legal presumption of incompe-
tency to make a will.   (*Estate of Latour,* 140 Cal. 415 [73
Pac. 1070, 74 Pac. 441].) "

Here the issue of undue influence was eliminated.   There
is no evidence of influence or suggestion of any kind tend-
ing to direct the deceased's testamentary acts.   The evi-
dence is plainly to the effect that he personally suggested

the making of the will and naming the beneficiary thereunder, and his conduct previous to his last illness tends to show that the will as executed and admitted to probate accorded with his desires. Under the circumstances, for instance, that he had suffered serious financial reverses, that his sister was jealous of what his wife had, and that he had a pronounced feeling of affection for his wife, the failure to provide for his brothers and sisters does not seem unusual. In the *Estate of Casarotti, supra,* the disposition was made to strangers by blood with whom the testator was living, to the exclusion of several brothers and sisters, and it was held that it was not an unnatural disposition to make.

In our opinion the state of the evidence does not tend to show incompetency to make a will either because of his physical condition or mental irresponsibility.

[10] 5. From the treatment of the foregoing points it is abundantly clear that the court did not err in instructing the jury to answer the first four questions in the affirmative and the fifth in the negative. In fact, it would have been error to refuse to direct a verdict, as there was no substantial evidence whatsoever tending to support any of the contentions made by the contestants.

The contestants contend, however, that the direction of the court precluded the jury from considering the following:

That the testimony of the handwriting expert shows that the signature of "Andrew Holloway" and the word "little" were written by the same pencil and different from the balance of the writing; that the paper upon which the will was written by the nurse was not a clean sheet of paper and shows erasures and unrelated commas and periods; that the signature of deceased on the will and the power of attorney were not made with the same ink, and shows that the letter "d" in the Christian name "Andrew" was placed on the will after November 13, 1917; that the signatures of the subscribing witnesses were "doctored"; all of which should have been considered by the jury in determining whether the documents were authentic.

That there is testimony corroborating that of Mrs. Ellen Parker to the effect that she was told the deceased made his will on November 16th; that on November 18th the wife of deceased left about 9 o'clock without saying anything, re-

turned about 1 in the afternoon with a legal document extending out of the ends of her pocketbook, and that the jury should have been allowed to consider whether or not the purported will was not fixed up on that day.

There is other testimony of a similar nature which the contestants contend was excluded from the consideration of the jury by the directed verdict. And that the question of whether or not the deceased was of sound and disposing mind could not have been considered by the jury without at the same time considering whether or not he declared the will to be his, or that it was signed by him, or at his request, or that said will was signed in his presence by two subscribing witnesses. "All these circumstances were necessary to determine whether or not he was of sound mind."

But, as we have shown, the evidence addressed to the execution of the will would not support findings that it was not duly executed and the court therefore properly directed the jury to find for proponent on those five issues. In respect to the claim "that all these circumstances were necessary to determine whether or not he was of sound mind," it is sufficient to say that there is no indication in the record that such evidence was not considered and weighed in determining the sixth issue—the mental unsoundness of deceased.

[11] 6. Under this specification of error it is claimed that the will duly executed by deceased on June 2, 1916, has not been revoked. The disposition of the questions as to the due execution of the will, the lack of undue influence, and the mental soundness of the testator render it unnecessary to discuss this point, since section 1296 of the Civil Code provides that a prior will is revoked by a subsequent will if such subsequent will contains provisions wholly inconsistent with the terms of the former will, and furthermore, the will executed and admitted to probate contains a provision expressly revoking all former wills.

7. By this specification of error the contestants contend that "This was the third trial in the Superior Court of this action. The jury, in the first trial, decided the man was of unsound mind; the second trial the jury disagreed, and we believe the jury rendered their verdict in this trial because of an error in instructing them, as before discussed. The jury rendered their verdict under the influence of passion

and prejudice, and the verdict is contrary to the evidence, and contrary to law.''

There was no error in refusing to grant a new trial for the same reason that it was not error to direct the verdict; and further, the record does not in any way show that the verdict rendered by the jury is the result of passion and prejudice.

[12] 8. The final point is that the court erred in instructing the jury that the offering and admitting to probate of the purported will established *prima facie* that the document was valid. It is contended that the instruction erroneously states that the admission of the purported will to probate created a presumption in favor of the validity of the said will, thus erroneously placing upon the contestants a greater burden of proof to overcome the presumption that the deceased was competent to make a will.

The instruction follows:

''Prior to the commencement of this action defendant herein had offered for probate as the last will of Andrew Holloway the document as to which the present controversy arises. This document was admitted to probate at that time. This *prima facie* established such document as the will of Andrew Holloway and the competency of Andrew Holloway to make a will. On this contest the law presumes that Andrew Holloway was competent to make said will, and the burden of proving that at the time of the execution of said will Andrew Holloway was incompetent to execute a will, is upon the plaintiffs and unless plaintiffs sustain such burden by proving by a preponderance of evidence that said Andrew Holloway was not at the very time said will was made competent to make the same your verdict must be for the widow, Annie Holloway.''

It is said in *Estate of Relph,* 192 Cal. 451, 459 [221 Pac. 361, 364] : ''The contest of a will on the other hand, while a proceeding *in rem,* is at the same time an adversary proceeding, the parties to which consist, on the one hand, of those persons interested in the estate who have appeared and filed written grounds of opposition to the probate of the will (commonly referred to as the contest) ; and, on the other hand, those persons interested in the will who have appeared and filed written answer thereto. The only issues of fact involved therein are those which are framed by the allega-

tions of the contest and the denials of the answer. . . . As to those issues the burden of proof rests upon the contestants . . . and the proponents are not called upon to submit any evidence until the contestants shall have produced some evidence legally sufficient to support their allegations upon one or more of those issues. If the contestants fail to produce such evidence, the decision of the contest must be against them, even though the proponents produce no evidence therein whatsoever.''

We do not think the instruction can be understood to declare that in a will contest the mere fact that the will had been previously admitted to probate would increase the burden of proof of the contestants. Reading the third sentence separately it states the rule correctly as applied to the admission of a will to probate where there is no contest. ''Under this rule, as long as the probate stands the will must be recognized and admitted in all courts to be valid, the unrevoked decree standing as absolute and conclusive proof of its genuineness.'' (*Tracy* v. *Muir,* 151 Cal. 363, 370 [121 Am. St. Rep. 117, 90 Pac. 832, 834].) The conclusion that the third sentence is entirely independent of and not to be read into the succeeding or fourth sentence finds support in sentences one and two, for they refer to a point of time anterior to the contest. ''On this contest'' is the opening phrase in sentence four. This sentence is confined to . contest of a will and is substantially correct, for it states the burden of proof is on the contestants and, of course, this is so whether the law *''presumes''* the testator was competent to make a will, as suggested by the instruction, or because of the rule that the party having the affirmative of an issue must prove it. (Sec. 1981, Code Civ. Proc.) The instruction does not purport to state any change in the rule of the burden of proof merely because the will had been admitted to probate.

The contestants cite *Estate of Nelson,* 191 Cal. 280, 286 [216 Pac. 368], in support of the asserted error in the instruction. In that case the holographic will was admitted to probate, and, on the ground the will was not entirely in the handwriting of the testator, it was sought to revoke the probate thereof. It was claimed that the dispositive clause of the will was written by the proponent, who was named the sole beneficiary. Judgment went for the con-

testant. The proponent appealed and based her claim for reversal upon certain asserted errors in the giving and refusing of instructions. She contended the court erred in refusing an instruction to the effect that under the presumption of innocence it is presumed the will was not written by her or by anyone other than the testator. The court in disposing of the point stated that another instruction, given at the request of the proponent, was more favorable to her than the one refused, the court holding that the instruction given was erroneous in declaring that after the purported will was admitted to probate all presumptions are in favor of its validity. Assuming that this conclusion was necessary to the decision, we fail to perceive how, as contestants contend, it conflicts with the instruction given herein. The court merely states that "On this contest the law presumes that Andrew Holloway was competent to make said will . . . "—this does no more than state the disputable presumption of law. The language does not purport to imply that this presumption of competency arose from the fact of the admission of the will to probate, but rather to the disputable presumption referred to. Furthermore, the language above quoted is restricted to the competency of the testator and does not involve the validity or invalidity of the will on the ground of its due execution; in no sense is it susceptible of the interpretation urged by contestants that the admission of a will to probate creates a presumption in favor of its validity.

The judgment is affirmed.

Waste, J., Richards, J., Seawell, J., Shenk, J., and Lennon, J., concurred.

Myers, C. J., did not participate in the foregoing decision.