[L. A. No. 3268. Department One.—December 10, 1912.]

In the Matter of the Estate of MARY B. PURCELL, Deceased. JAMES F. GARNER et al., Contestants and Appellants; CHARLES A. PURCELL et al., Respondents.

WILL—REVOCATION OF PROBATE—FRAUD—DEFECTIVE EXECUTION—EVIDENCE.—In a proceeding to revoke the probate of a will, it is held that the trial court was justified in holding that there was no substantial evidence of fraud or of any defective execution of the will.

ID.—UNDUE INFLUENCE— OPPORTUNITY TO EXERCISE — INVALIDATING WILL.—In order to invalidate a will on the ground of undue influence, mere evidence that the persons alleged to have exercised such influence had the opportunity to do so and might have done so if they had been so disposed and had possessed such influence, is insufficient. The undue influence must actually exist, it must be actually exerted and it must be so exerted as to affect the terms of the will.

ID.—CONFIDENTIAL RELATIONS WITH TESTATRIX—PRINCIPAL AND AGENT —BURDEN OF PROOF.—The fact that the confidential relation of principal and agent existed between the testatrix and an executor and beneficiary under her will, does not of itself prove that the will was procured by undue influence arising from that relation, nor cast upon him the burden of proving the absence of such influence at the time of its execution.

ID.—EVIDENCE—ATTORNEY WHO DREW WILL—CROSS-EXAMINATION TO REBUT INFERENCE OF UNDUE INFLUENCE.—Where in support of the issue of undue influence, the contestants, on the direct examination of the attorney who drew the will, elicited evidence tending to create an inference that a person charged with the exercise of undue influence was unduly active in the matter of the execution of the will and was endeavoring to influence the testatrix in his favor, it was proper for the proponents, on cross-examination of the attorney, to show what actually occurred during his consultation with the testatrix at her house in reference to the terms of the will and at a subsequent interview between them at his office at the time the will was executed, where such facts would tend to rebut such inference.

ID.—MENTAL CAPACITY—IMPAIRMENT OF MEMORY DUE TO AGE.—A testatrix having a slight impairment of memory due to old age which led her to rely on others more than she otherwise would, but who was nevertheless able to and always did think, talk, and act rationally, and manage such of her affairs as she there had in hand with

reasonable prudence and judgment, was not mentally incompetent to make a will.

ID.—MEDICAL TESTIMONY—OPINION BASED ON ERRONEOUS ASSUMPTION OF FACTS.—An opinion of a medical expert as to the mental incompetency of the testatrix, based upon a hypothetical question which assumed facts in respect to her mental condition entirely variant from those shown by the uncontradicted evidence, and upon a misconception of the effect of the evidence, cannot be given any probative force.

ID.—WANT OF TESTAMENTARY CAPACITY—EVIDENCE—NONSUIT PROPERLY GRANTED.—On a contest of a will on the ground of the want of testamentary capacity by the testatrix at the time of its execution, it is held, upon a review of the evidence on that issue, that the trial court was warranted in granting a nonsuit, and that on the whole case no reasonable person could believe that the testatrix had not sufficient mental capacity to make the will.

ID.—ADMISSION OF ONE OF SEVERAL LEGATEES—INCOMPETENT EVIDENCE. On a contest of a will on the ground of undue influence, evidence of a statement made by one of several legatees, which was in effect an admission tending in some degree to prove undue influence, is incompetent.

ID.—IMPEACHMENT OF PARTY'S OWN WITNESS—PRELIMINARY SHOWING.—On the trial of such a contest, the contestants cannot impeach their own witness by evidence of contradictory statements, unless they first show that they had been misled or surprised by the testimony he gave.

ID.—PROPONENTS' BILL OF COSTS—TIME OF FILING—JUDGMENT.—A ruling of the trial court granting a motion for a nonsuit on the contest of a will is not the judgment of the court, and the proponents' cost-bill is filed within the time allowed by section 1033 of the Code of Civil Procedure, if it be filed within five days after the judge signed the draft of the form of the judgment which was afterward entered in the minute-book.

ID.—FINDINGS NOT REQUIRED—DECISION.—No findings are necessary to such a judgment, and hence the "decision" referred to in section 1033 of the Code of Civil Procedure must be understood in such cases, to mean a judgment entered upon a motion.

APPEAL from a judgment of the Superior Court of Los Angeles County denying a petition for the revocation of a will, and from an order denying a motion to strike out a cost-bill.   Frank J. Finlayson, Judge.

The facts are stated in the opinion of the court.

Ball & Ball, Thomas Ball, Murphy & Poplin, and Park Henshaw, for Appellants.

Valentine & Newby, and E. A. Meserve, for Respondents.

SHAW, J.—Mary B. Purcell died testate on May 15, 1910. Her last will was executed on June 18, 1909, and was admitted to probate on June 1, 1910, on the petition of Charles A. Purcell and two other persons, all of whom were named therein as executors. Within a year thereafter the present proceeding was begun by certain of her heirs to revoke the probate of her will. The grounds alleged were: 1. That it was procured by the fraud and undue influence of Charles A. Purcell and others in collusion with him; 2. That at the time of its execution the testatrix did not have testamentary capacity, and 3. That it was not duly executed. Upon the trial, after hearing the evidence offered by the contestants, the court, on motion of the defendants, directed a nonsuit, and thereupon rendered judgment against contestants, dismissing and denying their petition for revocation. From this judgment the contestants appeal. They afterward moved to strike out the cost-bill filed by the defendants. This was denied, and they appeal from the order denying said motion.

1. The court was justified in holding that there was no substantial evidence of fraud or of any defective execution of the will. The rulings upon these points are not seriously attacked and we need not discuss the subjects.

2. The undue influence consisted of the alleged domination and control of Charles A. Purcell, assisted by Hannah D. Burke and Fannie Mayer, whereby they induced her to make a will in their favor contrary to her own wish and inclinations. Purcell was a brother, and Mrs. Burke a sister, of the deceased husband of the testatrix. Fannie Mayer was her housekeeper who, with Mrs. Burke, had lived for many years in the same house with the testatrix. The estate in question was worth over four hundred thousand dollars and was chiefly derived from her deceased husband, who died in 1901. Charles A. Purcell had been her business adviser and manager ever since the death of her husband. The most that can be said of the evidence on this branch of the case is that it shows that they

had the opportunity to exercise undue influence upon her in the matter of the making of this will and might have done so if they had been so disposed and had possessed such influence. This, however, is not sufficient. The undue influence must actually exist, it must be actually exerted and it must be so exerted as to affect the terms of the will. There is no substantial evidence of either of these conditions. The fact that the confidential relation of principal and agent existed between the testatrix and Purcell does not in itself prove that the will was procured by undue influence arising from that relation, nor cast upon him the burden of proving the absence of such influence at the time of its execution. (*Estate of Morcel*, 162 Cal. 188, [121 Pac. 733]; *Estate of Ricks*, 160 Cal. 461, [117 Pac. 532]; *Estate of Langford*, 108 Cal. 621, [41 Pac. 701]; *In re Calkins*, 112 Cal. 301, [44 Pac. 577].) There is no evidence that either of them suggested to her any of the provisions contained in the will.

3. In this connection it is proper to consider the claim that the court improperly allowed the cross-examination of L. H. Valentine to proceed upon matters beyond the scope of the examination in chief. Valentine was the attorney who drew the will and supervised its execution. Upon the examination in chief he testified that he had known Charles A. Purcell for about a year and a half prior to the execution of the will; that his residence was in Los Angeles about three hundred feet distant from that of Mrs. Purcell; that on June 17, 1909, the evening before the will was executed, at about seven o'clock, Charles A. Purcell came to his residence and stated that Mrs. Purcell had requested him, Purcell, to go to the house of the witness and ask witness to come to her house and see her about making a will; that Purcell did not sit down upon delivering this message, but left immediately; that in about half an hour, in response to the request, witness went to Mrs. Purcell's house and was admitted by either Mrs. Mayer or Mrs. Burke, and was directed to go upstairs to Mrs. Purcell's room; that he had no other conversation there and saw no one else; that he proceeded alone to Mrs. Purcell's room and there found Mrs. Purcell, Miss Smith, the nurse, and either Mrs. Burke or Mrs. Mayer; that the other persons except himself and the testatrix left the room and closed the doors; that he and Mrs. Purcell remained in the room from

about seven thirty until after ten o'clock. He then made an appointment with her to come to his office the next morning to execute the will which he was to prepare, and he went from her house directly to his own house, seeing no person on the way. He next saw Mrs. Purcell on the following morning before ten o'clock at his office. She was accompanied by Charles A. Purcell and Miss Smith as far as the reception room. She then went into his inner office and remained there at least an hour while she was executing the will. He saw Charles A. Purcell again that week on the street and again in May, 1910, at the time of her death, and he again saw Mr. Purcell in August, 1910.

On the cross-examination he was allowed to relate in detail all the conversation that occurred in the two interviews between him and Mrs. Purcell at her house and in his office. This evidence disclosed a prolonged conversation between them that evening, in which she discussed at length her affairs, her previous wills, her wishes concerning her relatives, and the disposition of her large estate, and in which she exhibited a familiarity with them and a fairly complete and accurate comprehension of all these subjects. It also tended to show that the will was the result of her own volition and not of suggestions by Mr. Purcell or any other person. The matters disclosed by the examination in chief were not relevant to the issue of mental incapacity. The evidence was offered by the contestants on the issue of undue influence. In this connection it is necessary to note that other evidence showed that Mr. Valentine had never before been consulted by her and that Mr. Murphey, attorney for the contestants, had drawn a former will. Also that there was some other evidence tending to create an inference that Mr. Valentine and Mr. Purcell were together in a room at Mrs. Purcell's house on the evening of and just preceding the consultation, no one else being present. The purpose of proving the few incidents related upon the examination in chief obviously was to show that Charles A. Purcell was instrumental in procuring the services of the attorney who prepared the will; that he and Mrs. Burke were in or about the house at the time of the consultation and that Mr. Purcell accompanied her to the attorney's office the next day when she went there to sign the will. The object was to prove facts which might cause the jury to infer that

Mr. Purcell was unduly active in the matter and that he was endeavoring to influence the testatrix in his favor, and from these facts to infer that the will was the product of his influence.

This being its purpose and effect, so far as it had any effect, it was proper for the other party on the cross-examination to show what actually occurred during the consultation and at the interview at the office, in order to rebut the inference, sought to be raised by the contestants from the facts brought out in the examination in chief, that Purcell or Mrs. Burke were in some way instrumental in directing or controlling the provisions of the will. The evidence on cross-examination did tend to rebut such inference and it was, therefore, within the discretion of the court to allow it to be given. (*People v. Rozelle,* 78 Cal. 84, [20 Pac. 36]; *People* v. *Teshara,* 141 Cal. 638, [75 Pac. 338]; *Jackson* v. *Feather R. W. Co.,* 14 Cal. 23; *Graham* v. *Larimer,* 83 Cal. 180, [23 Pac. 286]; *People* v. *Buckley,* 143 Cal. 388, [77 Pac. 169]; *People* v. *Gallagher,* 100 Cal. 475, [35 Pac. 80].)

4. We now come to the question whether or not there was evidence to support a verdict that the testatrix was of unsound mind at the time of the execution of the will if the case had been submitted to the jury. The will was made in anticipation of and shortly before a severe surgical operation upon the testatrix. She was then seventy-one years of age. There is some evidence which, if taken separately and apart from the qualifications and explanations which accompanied it, would tend to prove mental incapacity. For example, the surgeon who performed the operation upon the testatrix testified that from his observation and conversations with her during the two months from June 12 to August 11, 1909, it was his opinion that she was not of sound mind on June 18th, the date of the will. But, in explanation and on examination in chief, he said that she was affected only by a general enfeeblement of all the mental faculties, called by physicians *senile dementia;* that this begins as soon as a person's memory begins to fail because of age; that it was of varying degrees and that it did not necessarily or immediately destroy the capacity to transact business. It further appeared from his examination that it did not cause him to hesitate to enter

into an engagement with her to perform the serious operation which she underwent. On cross-examination he said that the testatrix was, during that time, rational, both in appearance and in conversation; that she was not insane and did not appear to be insane; that she had no delusions, and that what he meant by saying that she was of unsound mind was that there was some failure of memory or judgment. These were not made as statements inconsistent with those made on the examination in chief. He evidently regarded the respective statements as entirely consistent with each other. His theory appears to have been, as some of the medical witnesses stated it, that her unsoundness of mind was of a medical nature; that her brain was not perfect because of the deterioration of age. Being asked for details showing mental unsoundness, he said that her mind was slow; that she did not grasp things quickly and had to take time for reasons and answers; that she would not decide about having the operation without advising with her brother-in-law, Charles A. Purcell; that she said she had always relied on Purcell to transact her business; that she talked about founding a hospital, asked the witness about the cost of a hospital, and seemed to rely on the opinions of the witness and others about it, but that in all she said she was rational both in manner and in the reasons she gave, and her ideas, though expressed slowly, were expressed well and clearly.

It is clear from all this that, although the physician was of the opinion that as a matter of medical science her mind was not physically entirely sound, all that he meant by that opinion was that she had a slight impairment of memory due to old age which led her to rely on others more than she otherwise would, but that she was nevertheless able to and always did think, talk, and act rationally, and manage such of her affairs as she there had in hand with reasonable prudence and judgment. The witness himself appeared to believe that she should have decided about the operation without consulting her brother-in-law, who had been for years her trusted business manager. The medical profession may describe such a condition as *senile dementia* and declare such a person mentally unsound, but it does not constitute the sort of incompetency or insanity which, in the estimation of law and of men of ordinary sagacity and prudence, renders

a person incapable of executing contracts or making a will. Her conduct and conversation, as detailed by the physicians, rather tended to show that she herself was aware of her failing memory of recent events and that she prudently chose to rely upon others in whom she had confidence in her business affairs, and that in all other respects she had at least ordinary wisdom, judgment, and mental capacity.

There was also the testimony of three physicians who had never known the testatrix, given in answer to a hypothetical question, to the effect that, assuming that the facts stated in the question were true and fairly described her condition, she was of unsound mind at the time she executed the will; that *senile dementia* had affected her so that her memory was defective, her will weakened and her former judgment impaired sufficiently to make her incompetent. The question put did not state the case fairly nor fairly describe her condition. It included every statement contained in the evidence which tended in the least to show *senile dementia,* or which by any possibility could be construed to have that tendency, and it excluded the explanations, qualifications, and modifications accompanying those statements, as given by the witnesses who made them. In this way it presented a distorted and inaccurate description of the condition of the testatrix, as shown without conflict by the evidence as a whole. For example, the question stated that she appeared to the physicians at the hospital as an infirm, feeble old lady with her mental faculties impaired, enfeebled and breaking down and suffering from a loss of memory, but it did not state their testimony that at the same time she was not insane but was sane and rational and that the reasons she gave for what she was doing appeared to be good, sound, and rational. Again the question included a passage from the will in which she declared that she had always desired to devote a large part of her property to charity, but that under the "exigencies of this will" she was not then "able to designate the particular charities" to which she desired to extend her bounty; that Charles A. Purcell knew her desires in that regard and that she left the matter wholly to him, without imposing upon him any duty or trust in regard thereto. This passage was taken by these physicians as evidence that her memory was at that time so bad that she could not

recollect her wishes on the subject or the charities she had previously had in mind, and their opinions were, in part, based upon this supposed fact. In truth, however, the evidence showed, without conflict, that she was correctly advised by her attorney that, under the laws of California, she could not by her will give more than one-third of her estate to charity; that for that reason she could not make the charitable bequests that she desired, and that this clause was inserted for the purpose of informing her acquaintances that she had not entirely forgotten the charitable intention she had so often expressed to others in her lifetime, and that the language of the clause was chosen by her attorney to accomplish that object and at the same time to avoid creating a precatory charitable trust, which trust would likewise have been invalid as to the excess over one-third of the estate. The passage did not at all indicate the want of memory or feebleness of mind which the physicians attributed to it. One, at least, of these physicians based his conclusion, in part, on facts not given in the hypothetical question. An opinion given by an expert upon assumed facts so variant from those shown by the uncontradicted evidence and upon such misconceptions of the effect of some of them cannot be given any probative force, even in the absence of the other evidence already stated explanatory of the mental condition of the testatrix.

There was also the testimony of some acquaintances, more or less intimate, that they were of the opinion that she was of unsound mind shortly before she made this will. But of these witnesses, Hallett said that she always talked rationally and coherently, knew all about her relatives, talked intelligently on whatever was the subject of conversation, and was rational every time and seemed to know what she was talking about, and that he could not say she was insane. His reasons for thinking her of unsound mind were that she had changed in her actions; that after telling a thing she would sometimes repeat it in twenty minutes; that her mind was not "concentrated" particularly and that she thought a good deal about her death. Mrs. Jeannette A. Garner was of a like opinion because the testatrix was so forgetful that "she could not remember anything she said or did ten minutes before." On cross-examination she said that she could not

say that the testatrix was insane, but that she was not of a strong mind; that after the operation the testatrix gave her a small table and asked her to pick it out herself and the witness thought the fact that the testatrix asked her to select it indicated that she was not of very strong mind; also that she borrowed five hundred dollars from the testatrix in September after the operation and that she did not at that time think anything about the testatrix being of unsound mind and did not know anything about it; that she would not term it an unsound mind but not a very strong mind, and that she got the explanation of the term "unsound mind" from the doctors. Evidently what the witness meant by stating that the testatrix was of unsound mind was that she had some impairment of the mental faculties usual to old age. It is significant also that these acquaintances did not hesitate to deal with the testatrix and none of them ever seemed to have contemplated such a proceeding as having her declared incompetent and put under guardianship, notwithstanding the fact that she had such a large estate subject to her disposal.

The testimony of Mr. Valentine is not, strictly speaking, in conflict with any evidence of the witnesses as to her mental condition. He spoke of the time when she was actually making her will. He gave at length the conversations between him and her regarding it. These conversations not only showed an entire absence of influence of any other person at that time, but also showed that the testatrix was at that time entirely sane and capable of undersanding her affairs, of remembering her relatives and family connections and of making a testamentary disposition of her estate. A reading of this testimony is convincing to the effect that there is no foundation for the idea that she was then so lacking in mental capacity or that there was then such a failure of memory that she was incapable of executing a will. If there were times when she was incapable of transacting business the time when she executed the will was clearly one of her lucid intervals. A careful reading of the whole evidence brings us to the same conviction as that which actuated the trial judge in granting a nonsuit, a conviction that on the whole case no reasonable person could believe that she had not sufficient mental capacity to make the will in question.

Questions of this character have often been presented to this court. In *Estate of Chevallier,* 159 Cal. 168, [113 Pac. 133], it is said: "It is important, preliminarily, to observe that it is not every form of insanity, not every mental departure from the normal, which destroys an otherwise valid testamentary act. The rule of law is not that no person who is insane may make a valid will, but that the will of no person who by reason of insanity is incapable of making valid testamentary disposition shall be upheld. Thus, the wills of aged and infirm people, of people sick in mind, as well as in body, are always upheld, if, nothwithstanding their enfeeblement, testamentary capacity is shown. So, again, it may be well and perhaps soundly reasoned that all persons who commit crime and that all persons who commit suicide are aberrant, abnormal, and therefore insane. But such is not the insanity which the law has in mind. It must be an insanity of one of two forms, either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion. And, even in the latter class of cases, it would not be sufficient merely to establish that a testator was the victim of some hallucination or delusion to avoid the will. The evidence must go further and establish that the will itself was the creature or product of such hallucination or delusion, or, in other words, that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument." In *Estate of Dole,* 147 Cal. 191, [81 Pac. 535], we said: "Even in old age, if the testator knows his property and the manner in which it is invested, and his relatives who are the object of his bounty, he may make a valid will. It is not necessary that his memory be perfect. The aged person often fails to remember the details of business and the names of his friends, but this is often the case with persons in the prime of life. The memories and reasoning powers of people, even in the prime of life, differ as the features of each individual differ in a multitude of ten thousand." In *Estate of Redfield,* 116 Cal. 637, [48 Pac. 794], the judgment of the court below was that the testatrix made the will in question while she was of unsound mind. The facts shown by the evidence are related at length and make fully as strong a case as that disclosed in

the case at bar. Nevertheless, the court held that it was insufficient in law to support the judgment and reversed the case for that reason.

For these reasons we conclude that there was no error in directing a nonsuit upon the issue of mental incapacity.

5. A number of rulings upon the admission and exclusion of evidence are assigned as error. Many of them were cured by the subsequent admission of the evidence thus excluded. These we will not mention.

That the court correctly excluded testimony of a statement claimed to have been made by Charles A. Purcell, the residuary legatee, to the effect that "he wrote the will and Valentine put it in legal form," is settled by the decisions of this court in *Estate of Dolbeer,* 149 Cal. 245, [9 Ann. Cas. 795, 86 Pac. 695], and *Estate of Dolbeer,* 153 Cal. 662, [15 Ann. Cas. 207, 96 Pac. 266]. The excluded statement was no more than an admission tending in some degree to prove undue influence. Being an admission of one of several legatees, against the validity of the will, it was incompetent, under the rule established by those cases.

The testimony of Mrs. Garner as to statements made by the witness, L. H. Valentine, was properly rejected. Valentine was contestants' own witness, the evidence offered was incompetent, except for the purpose of impeaching him, and this contestants could not do unless they first showed that they had been misled or surprised by the testimony he gave. They made no attempt to show such deception or surprise. The ruling would have been harmless even if it had been erroneous. The statements imputed to Mr. Valentine by the question put to Mrs. Garner, so far as they were material at all, related wholly to the issue of undue influence and if admitted they would not have strengthened the contestants' other evidence on this branch of the case sufficiently to have established it.

6. The appeal from the order refusing to vacate the judgment for costs and strike out the cost-bill is without merit. The minutes of the daily proceedings of the court of January 9, 1912, state that the motion for nonsuit was "renewed by defendants in the presence of the jury and motion granted by the court." On January 10th, in pursuance of this ruling, a formal judgment of nonsuit, including judgment in favor of defendants for their costs, was drawn and signed by

the judge presiding in the case. On January 12th this formal judgment was filed and entered in the judgment book. The record so designates this book but it was evidently intended to refer to the "minute-book" in which probate orders and decrees are required to be entered. (Code Civ. Proc., sec. 1704.) The ruling granting the motion for a nonsuit was not, as the appellants claim, the judgment of the court. The judgment upon that ruling was not made until at least the following day when the judge signed the draft of the form therefor, and was not filed or entered until January 12th. The court had not lost jurisdiction of the case, and its judgment entered on January 12th was the only judgment in the cause. The cost-bill was filed on January 15, 1912, five days after the judgment was signed. This was within the time allowed by law. (Code Civ. Proc., sec. 1033.) No findings are necessary to such a judgment, and, hence, the "decision" referred to in the section just cited must be understood, in such cases, to mean a judgment entered upon a motion.

The judgment and order appealed from are affirmed.

Angellotti, J., and Sloss, J., concurred.

Hearing in Bank denied.