[S. F. No. 11262. In Bank.—August 13, 1925.]

In the Matter of the Estate of MATTHEW PRESHO, Deceased. LAURA C. PRESHO, Respondent, v. THOMAS H. PRESHO et al., Appellants.

[1] WILLS—CODICIL—CONTEST—NONSUIT.—In a contest of the probate of a will and codicil, if the evidence presented by the contestant, viewed in its most favorable light, would not support a verdict in her favor, the trial court should have granted a motion for nonsuit interposed by the proponents as to certain issues affecting the proposed will.

[2] ID.—VERDICT—EVIDENCE—INFERENCES.—As to the sufficiency of the evidence, if from all the evidence the verdict in favor of the contestant is based on material facts legally proved or on inferences which may be reasonably drawn from those facts, even though there be an honest difference of opinion as to the effect of the evidence, the verdict will be deemed supported.

[3] ID.—WANT OF TESTAMENTARY CAPACITY TO EXECUTE WILL—EVIDENCE.—In such contest, on the issue of want of testamentary capacity, it cannot be said that the evidence on behalf of the contestant, who was the wife of the deceased, was sufficient to establish that, on the day when the will was signed, the deceased was affected with general testamentary incapacity or suffering from such insane delusions that he was not on that day familiar with the extent of his property, did not know those who would be the natural objects of his bounty or that he did not know and understand the nature of the act in which he was then engaged.

[4] ID.—TESTAMENTARY INCAPACITY—EVIDENCE.—In such contest, the statements of a physician, who last saw deceased more than a year prior to the time when the will was signed, that the deceased was of unsound mind, and statements of friends and acquaintances as to his weakened mental and physical condition fall far short of the requirements upon which testamentary incapacity may properly be founded and are not sufficient to avoid a nonsuit.

[5] ID. — BELIEF OF DECEASED — INSANE DELUSION. — In such contest, where the deceased frequently expressed his belief that his wife (the contestant) was doping and poisoning him, but he soon thereafter changed his attitude and said he knew she would not do such a thing, such belief was not irrational because it was not permanent, and it was not an insane delusion because it was based on statements made to him by his brother, a person in whom the deceased unquestionably had confidence.

[6] ID.—IRRITABILITY AND BAD TEMPER—NOT INCONSISTENT WITH TESTAMENTARY CAPACITY.—Irritability and bad temper may result in unnatural actions but they are not inconsistent with testamentary capacity.

[7] ID.—UNDUE INFLUENCE AS TO WILL—FINDING—EVIDENCE.—In such contest, the evidence on behalf of the contestant was insufficient to support a finding that such undue influence was exercised over deceased by his brother at the time the will was executed as to destroy the free agency of the deceased and overcome his volition at that time.

[8] ID.—CONFIDENTIAL RELATION—ACTIVITY IN PREPARATION OF WILL. Proof of a confidential relationship between deceased and his brother is not in itself sufficient to establish undue influence.

---

3. What constitutes capacity or incapacity to make will, notes, 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444. See, also, 28 R. C. L. 86 et seq.

5. See 28 R. C. L. 102.

6. See 28 R. C. L. 89.

8. Evidentiary force of circumstance that one benefited by a will was the draftsman thereof, or was active in procuring its execution, note, 28 L. R. A. (N. S.) 270. See, also, 28 R. C. L. 145.

There must in addition be proof that the one occupying such relationship displayed activity in the preparation of the will to his undue profit.

[9] ID.—FRAUD AS TO WILL—EVIDENCE—INSUFFICIENCY OF.—In such contest, evidence that the brother of deceased continually charged the deceased's wife (the contestant) with "doping" her husband; that this charge was repeatedly made in the presence of the deceased, was untrue, was known by the brother to have been untrue, and was believed by the deceased, was insufficient to overturn the will on the ground of fraud, where the will was not unfair to the contestant and it cannot be said that the statements so credited to the brother were reflected in the provisions of the will to her detriment.

[10] ID.—MOMENTARY CONFUSION—INFIRMITIES OF AGE—PHYSICAL DEBILITY—EXECUTION OF CODICIL.—A condition of momentary confusion on the part of a testator due to old age and general physical debility is insufficient to overthrow the presumption of sanity existing in favor of the testator at the time of the execution of a codicil to his will. The infirmities of age and lapse of memory are not sufficient in themselves to establish lack of testamentary capacity.

[11] ID. — FRAUD IN EXECUTION OF CODICIL — INSUFFICIENCY OF EVIDENCE.—In such contest, the evidence was insufficient to justify the special finding of the jury that the codicil to the deceased's will was the product of fraud practiced upon the deceased by his brother.

[12] ID.—UNDUE INFLUENCE IN EXECUTION OF CODICIL—SUFFICIENCY OF EVIDENCE—INFERENCES.—In such contest, on the special issue of undue influence as to the codicil, there was sufficient evidence from which reasonable inferences might be drawn that the execution thereof was the result of influence in its procurement directly brought to bear upon the deceased by his brother.

[13] ID.—CIRCUMSTANTIAL EVIDENCE OF UNDUE INFLUENCE.—Evidence that pressure was, on the day the codicil was executed, brought to bear on the testamentary act need not be direct. Circumstantial evidence is sufficient.

---

(1) 40 Cyc., p. 1334, n. 63 New.  (2) 4 C. J., p. 853, n. 63, p. 854, n. 64; 23 C. J., p. 51, n. 76, p. 54, n. 16.  (3) 40 Cyc., p. 1023, n. 29. (4) 40 Cyc., p. 1037, n. 40, p. 1041, n. 58.  (5) 40 Cyc., p. 1014, n. 70, p. 1024, n. 33.  (6) 40 Cyc., p. 1024, n. 34.  (7) 40 Cyc., p. 1145, n. 54.  (8) 40 Cyc., p. 1148, n. 72, p. 1165, n. 87, p. 1168, n. 10, p. 1169, n. 15.  (9) 40 Cyc., p. 1033, n. 12, p. 1146, n. 57.  (10) 40 Cyc., p. 1008, n. 17, p. 1018, n. 94, 95.  (11) 40 Cyc., p. 1165, n. 87. (12) 40 Cyc., p. 1165, n. 86.  (13) 40 Cyc., p. 1164, n. 78.

196 Cal.—41

APPEAL from a judgment of the Superior Court of Santa Clara County. P. F. Gosbey, Judge. Affirmed in part; reversed in part.

The facts are stated in the opinion of the court.

C. L. Witten, H. W. McComas, Ward Sullivan and W. A. Beasly for Appellants.

Owen D. Richardson for Respondent.

SHENK, J.—This is an appeal from a judgment refusing to admit to probate a document purporting to be the will of Matthew Presho, deceased, and a codicil thereto. The judgment was entered pursuant to a verdict finding on six special issues in favor of the contestant, Laura C. Presho. Matthew Presho died in the county of Santa Clara on April 20, 1923, being about seventy-three years of age, and leaving an estate of approximately $40,000. The proposed will was signed on May 5, 1921, and the codicil on March 31, 1922. Surviving him are his widow, the contestant and respondent herein, and certain brothers and sisters. Thomas H. Presho, a brother, is the proponent and one of the appellants. The other appellant is Nellie Elizabeth Presho, an only daughter of Thomas and one of the beneficiaries under the will. Matthew left no children. The provisions of the will devised and bequeathed to the contestant the home place consisting of a fifty-vara lot at the corner of San Carlos and Third Streets in the city of San Jose, together with the household goods. On the lot is a house in which Matthew and his wife made their home and a thirteen-room house which they rented. This property is variously appraised, but its fair valuation is about $21,500. A house and lot, also in San Jose, valued at approximately $7,000 was devised to the appellant niece. Thomas was left the residue and was appointed executor without bonds. The proponent contends and it is not denied that the larger part of the estate was the separate property of the deceased and that the contestant would receive under the terms of the original will fully one-half of the estate. The codicil reduced the contestant's share to a life estate in the fifty-vara lot.

The grounds of opposition to the proposed will and to the codicil, separately stated as to each document, are (1) want of testamentary capacity, (2) undue influence on the part of Thomas Presho, and (3) fraud. The jury rendered its verdict in favor of the contestant as to both the will and codicil on each ground of contest. At the close of contestant's case a motion for a nonsuit was interposed as to the three issues affecting the proposed will and was denied. Said motion was not directed to the three issues affecting the proposed codicil. After the entry of judgment a motion for a new trial was made and denied.

The appellants contend that the motion for a nonsuit should have prevailed, that the evidence was insufficient to justify the verdict, and that the court committed certain prejudicial errors during the course of the trial. [1] As to the motion for a nonsuit, if the evidence presented by the contestant, viewed in its most favorable light, would not support the verdict in her favor the court should have granted the motion. (See *Estate of Chevallier,* 159 Cal. 161 [113 Pac. 130].) [2] As to the sufficiency of the evidence, if from all the evidence the verdict is based on material facts legally proved or on inferences which may be reasonably drawn from those facts, even though there be an honest difference of opinion as to the effect of the evidence, the verdict will be deemed supported. (*Field* v. *Shorb,* 99 Cal. 661, 666 [34 Pac. 504]; *Ryder* v. *Bamberger,* 172 Cal. 791 [158 Pac. 753]; *Hind* v. *Oriental Products Co.,* 195 Cal. 655 [235 Pac. 438]; 2 Cal. Jur. 879, and cases cited.)

Matthew and Laura C. Presho were married in October, 1905. Prior to that time Matthew had been in business in San Jose about twenty-one years, most of that time in partnership with his brother Thomas, in the wood and coal business. The partnership continued until June 1, 1918, when it was dissolved. Matthew and his wife lived alone in their home on the property at the corner of San Carlos and Third Streets until 1919. Thomas then went to live with them and remained with them until the death of Matthew. During the time the couple lived alone their relations were amicable, the deceased attending to his business with regularity and the wife attending to her household duties. In 1916 the deceased contracted a disease of the stomach which grew worse in later years and ultimately caused his death.

From the time Thomas came into the household in 1919 there was dissention between him and the contestant. The trouble became aggravated as time went on, Thomas charging the contestant with improper and inefficient care of her husband and the contestant contending that Thomas was usurping her place in the home and attempting to cause an estrangement between herself and her husband.

On the issue of want of testamentary capacity the respondent relied on certain testimony, which will be noted, as sufficient to support the verdict. In response to a question as to whether she noticed any irrational conduct on the part of her husband from the time Thomas came to live with them until the date of the will and thereafter until the date of the codicil the contestant testified: "A. The first thing of all he [the deceased] was of a very positive nature; he could not be ruled or controlled by anybody; he would have bad nights, couldn't sleep, and he would say, 'You poisoned me, you doped me; I can't stay in this house because Laura, you are doping me'; and I would say, 'Why Matthew dear, I wouldn't hurt a hair of your head,' and then he would say, 'I know you wouldn't.' And then he would kiss me and tell me how much he loved me, and then he would say, 'I wouldn't take anything from you Laura if I thought that,' and then that would come all over again every day, every morning. . . . Q. Can you state any other irrational acts that your husband did during the time and in the presence of Thomas Presho, during the time that Thomas Presho was at your house? A. He would say, 'Laura, you are no relation to me; you are a stranger; you go home to your mother and stay, or else I will pay your board at the Vendome,' and then in a few minutes after that he would be loving and kissing me, and telling me how much he loved me. And another time, I had some cushions,—he had some cushions on the chair, and I am very short, and it made me up too high in the chair so I took the cushions out gently, and he was very easily angered,—and without any provocation he began beating me over the head. He was so weak and feeble that I was surprised, and I got out of the chair and I put my arms around him and said, 'God forgive you Matthew, you know not what you do,' and I went upstairs and cried and cried. This was just before we went to the Home of Rest, and that was about January 1, 1922. . . .

That codicil was drawn about eleven days after he came home from the Home of Rest. We came home March 20, 1922, and then another thing,—I was getting my dinner one day, and he had been just as sweet and nice as possible, and all of a sudden he jumped up and said, 'You, you, you are trying to dope me; you are trying to poison me.' And he came toward me, looking as wild and angry as he could be. 'You are trying to dope me Laura,' and he went like this [indicating by placing hands around her neck] trying to choke me. I don't remember when this was exactly; I think it was after he came home from the Home of Rest, a couple of days after. . . . But I said, 'Matthew, don't you know that if a person would do that, that is criminal, I would be taken to the penitentiary if I were to do anything like that. . . . Q. Do you think of any other irrational acts that your husband did? A. Well, he was very quick and irritable, without any cause, without any provocation. He was not able to eat during the last months of his illness; he practically starved to death; not that he didn't have enough to eat, but that it did not assimilate. . . . He did not eat any solid food at all during the last six months. In my opinion my husband was not of sound mind in the year 1921, and the year 1922. Q. Give us some of your reasons for saying he was not of sound mind? A. I have given you so many reasons. He was so easily influenced, and Tom Presho kept him in an antagonistic mental attitude against me, and kept him angry with me all the time, and when he was angry he lost his head completely, and I don't think he would have done the things he did if he was himself. Tom Presho kept him in an angry state against me; he hammered at him from morning until night against me, and I heard him. And I can give you another reason for thinking he was not of sound mind; just before Tom Presho took my husband away to the sanitarium, he got him out of bed in the Morris chair, and I went in there suddenly, and Tom Presho had written out a check and he had his hand over my husband's hand, and was guiding him with the name, and I came in and he jumped up and stepped aside and Matthew did finish it out alone. At times my husband appreciated me highly, and again he did not seem to realize I was his wife; because he would tell me I was a perfect stranger to him, and he would say, 'You don't belong here Laura; you are no rela-

tion to me.' He said that many times before and after the dates of the will and the codicil, May 5, 1921, and March 31, 1922. . . . Q. Did you know that Mr. Presho talked with different people who came in there, on the topics of the day, intelligently. A. When he was kept in a passive mood, or when Tom Presho was not there, he was all right; but when Tom Presho kept him in an angry way, he completely lost his head. I never discussed his business affairs with him. I do not know whether or not he knew and understood and appreciated the nature and extent of his property. I can't tell you whether he knew and understood his bank account when he took off Tom's name and put my name on there. Q. Now, prior to the 5th day of May, 1921, will you state and describe all irrational acts or statements that you ever heard your husband make? A. Well, when he was at the woodyard he came home one day with a wire around his body, and I said, 'What is that for?' and he said, 'I am going to get well by having that on.' That struck me as very erratic. This was one strand of copper wire, and he wore it next to the flesh. He had it on his body when he came home. He must have put it on at the woodyard. No one was present when he exhibited it to me. When he came home that night the wire was on his body, and he wore it for quite a while. I don't recall whether he told me that anyone had advised him to wear that, to treat himself for sickness. Q. Now, give another irrational act or irrational statement prior to May 5, 1921? A. Well, he was very, very, very quick tempered, but he was over it in a flash, and then he was very penitent and very loving. Q. And you would call that one of the reasons, you say, for thinking he was of unsound mind? A. I didn't say that. Q. I am asking you now; I am trying to make it clear to you that I want you to detail any act, that in your opinion, was irrational on the part of your husband, or to detail any statement made by him prior to May 5, 1921? A. Well, sometimes he was so poor, I thought that we wouldn't have enough to eat; then another time he would say he was worth from $80,000 to $100,000; to my mind that is not like a sound man, because sometimes it was pitiful, he was so poor. I think that was during war time. Matthew would say to me, 'Laura, we are making so much money, it is just like pouring down a chute, it makes me dizzy,' and I

said 'Let us have a player piano,' and then he was so poor,
he didn't have five cents to his name.  As a matter of fact
business was very good during the war; he said it was com-
ing in like a chute, it made him dizzy.  I guess the fact is
he didn't want to buy a player piano.  Q. That is one of
the things that your husband did that leads you to con-
clude that he was of unsound mind?  A. I think so, yes.
Q. Now, give me another act or statement, prior to May 5,
1921, that to your mind was irrational?  A. Without any
cause whatever he would take dislikes to people.  Sometimes
he would be so friendly with them, and then again he would
be positively rude to them, the same people.  I think it was
during his sickness, the beginning of his sickness. . . . Q.
Can you recall now any other act, or any other statement
made by your husband prior to the 5th day of May, 1921,
that indicated he was irrational?  A. Yes.  I was always
allowed to go in the automobile, and understood it belonged
to him, belonged to the two of them; and then it got so
I was not allowed to go in the automobile, and Matthew
said one day, 'I want you to go in the automobile this morn-
ing.'  And I said, 'What am I to understand, you have
been riding around without me all the time, and you didn't
miss me, and I guess I won't go today.  You tell me one
day it belongs to you, and the next day you say it is all
Tom's.'  At one time he would tell me the automobile be-
longed to him, and the next time he would tell me it was all
Tom Presho's.  This is one of the reasons I have for think-
ing my husband was of unsound mind.  It was a partnership
automobile, and I knew it was.  He told me it belonged to
him, and he told me it belonged to both of them.  And an-
other thing, he would tell me a thing one time, and then he
would contradict what he said completely.  I think it was
this way: the reason I think he was of unsound mind is this
way: one time Tom Presho was standing in front of the
sink, and I came up and put my fingers, just touched him
with my hand because he was in the way, and Tom abused
me; called me [vile names] ; and Matthew, that was one of
the times he had a normal period and was himself, and saw
the injustice of Tom's brutality, and Matthew said, 'Tom,
you leave this house; I don't want you to stay here; don't
you take another meal here,' and Tom didn't take any more
meals there.  And then again, my husband would let Tom

abuse me, so you see he was not rational, because one time he would let him abuse me, and another time he would stand up for me. Q. Was that one of the things that made you think he was irrational? A: No, that was one of his rare moments, when he was competent. Q. Give us . . . the most irrational statement that your husband ever made, or describe the most irrational act, to your mind, showing that he was of unsound mind prior to May 5, 1921? A. I can recall it very plainly. He was shaving up in the bedroom, about 1920, and without any cause, he used to get mad without a cause, because he was sick and irritable, and he said, 'I will take this razor and I will put it across your neck,' and I said, 'Matthew, you wouldn't do that.' And in a few minutes after that he said, 'Laura, you would trust me, wouldn't you; you know that I wouldn't hurt you,' or something like that, but at the time I almost thought he would. No one was present but my husband and myself. . . . Another peculiar thing he did; when we slept together [prior to 1919] we had a great big bay window that we kept open, and we would leave that open but we would always shut the door, and he would make me leave a marble block in the door to keep it open. . . . I don't know what for, for we had always kept it closed, but he wanted it open.''

Dr. J. T. Blair, a physician and surgeon, who attended the deceased professionally in the latter part of 1919, was of the opinion that in that year the deceased was not of sound mind. He testified: ''I knew the deceased Matthew Presho. I had known him before 1919, and I had seen him occasionally before that, and I last saw him the latter part of 1919 at his home. Matthew Presho did not call me professionally, but his wife did. At that time she called me down to look him over, but that was the last time I saw him. I went over him pretty carefully, but I couldn't make anything out of him, and he said he didn't want any doctor, and I just let it go at that. His wife wanted me to look him over, and see what was the trouble with him, and I couldn't make anything much out of him, and he would not follow my instructions, so I thought it best to let the matter rest. This was in the latter part of 1919. At that time I formed an opinion as to the soundness of mind of the deceased. I don't think he was of sound mind. I formed that opinion at that time, and that was the only time I saw him.

Q. What reason had you for that opinion? A. Well, I asked him several questions, and he couldn't give me any intelligent answers. I asked him about his general condition, how long he had been sick, and how he felt sick.''

Sadie E. Jefferson testified she had known the deceased for the last three years of his life; that during those three years she had talked to him six or eight times and that she had noticed he was getting mentally weaker from and after the first time she saw him.

Dr. A. T. McGinty testified that he had attended the deceased professionally; that he had heard either in the home or at his office some intimation that contestant might have put something in the food of the deceased, but ''it was not an accusation, it was no more than a suggestion that she might have put something in his food, and that was said by either Tom or the deceased, I don't remember which one. . . . Mr. Presho [the deceased] was always ready to know what was going on and asked me how things were and how business was, and how things were going around town.''

Mrs. Belle Quinn testified that she had known Matthew Presho for about fifteen years. The last time she saw him was in October, 1921. She saw him at her own home and he was very feeble at that time. She again saw him in 1922, when he looker rather frail, and the expression of his eyes looked very glassy, and his face was strained and drawn and he spoke very little.

Mrs. Charles Herrmann testified that on a day she could not remember she called to see Mrs. Presho. She noticed the deceased at the door and said to him: ''I want to see Laura,'' and he did not recognize the witness. He simply said, ''Walk in.'' Later on he came into the house and addressing the witness said, ''Mrs. Herrmann, I did not know you for a moment when you were outside.'' That was all that was said. The only thing said or done by the deceased that indicated to this witness that the deceased was not rational was that ''he allowed his brother to talk to his wife the way he did.''

[3] Considering the foregoing evidence and the other evidence in the record on behalf of the contestant in a light most favorable to contestant's contention it cannot be said that it is sufficient to establish that on the fifth day of May, 1921, when the will was signed, the deceased was affected

with general testamentary incapacity or was suffering from such insane delusions that he was not on that day familiar with the extent of his property, did not know those who would be the natural objects of his bounty or that he did not know and understand the nature of the act in which he was then engaged. (*Estate of Dolbeer*, 149 Cal. 227 [9 Ann. Cas. 795, 86 Pac. 695]; *Estate of Chevallier, supra; Estate of Purcell*, 164 Cal. 300 [128 Pac. 932]; *Estate of Collins*, 174 Cal. 663 [164 Pac. 1110]; *Estate of Casarotti*, 184 Cal. 73 [192 Pac. 1085]; *Estate of Holloway*, 195 Cal. 711 [235 Pac. 1012].) [4] The statements of a physician who last saw him in 1919 that the deceased was of unsound mind and of friends and acquaintances as to his weakened mental and physical condition fall far short of the requirements upon which testamentary incapacity may properly be founded (*Estate of Purcell, supra*) and are not sufficient to avoid a nonsuit (*Estate of Anderson*, 185 Cal. 700, 714 [198 Pac. 407]). [5] As the evidence shows, the deceased frequently expressed his belief that his wife was doping and poisoning him, but he soon thereafter changed his attitude and said he knew she would not do such a thing. This belief was not irrational because it was not permanent and it was not an insane delusion because it was based on statements made to him by Thomas, a person in whom the deceased unquestionably had confidence (*Estate of Kendrick*, 130 Cal. 360 [62 Pac. 605]). The deceased stated to his wife that she was a stranger to him. This statement was made when he was in a condition of irritability, but as soon as the spell had passed he would recant and express his deep love for her. There can be no pretense that such a statement was made in the sense that he did not recognize his wife. [6] Irritability and bad temper may result in unnatural actions but they are not inconsistent with testamentary capacity (*Estate of Riordan*, 13 Cal. App. 313 [109 Pac. 629]).

[7] As to the alleged undue influence affecting the execution of the will, the respondent relies on the foregoing evidence and in addition thereto the further testimony of the contestant that Thomas Presho began when he came into their home to tell decedent that contestant was "doping" him, was trying to kill him, was trying to railroad him to the asylum, and was keeping him sick, "that this was said

every day, commencing from the time Tom came to the house, I think it was continuous." She testified that she did not "dope" her husband; that before the will was executed Thomas stated in the presence of the deceased that the respondent was not true to her marital obligations; that the will was made secretly so far as she was concerned, for she knew nothing of it until after the death of the deceased. But such evidence does not constitute proof of pressure brought to bear directly upon the testamentary act (*In re McDevitt,* 95 Cal. 17 [30 Pac. 101]; *Estate of Anderson, supra*). [8] Abundant proof, as respondent contends, of a confidential relationship between the brothers may be assumed, but such proof is not in itself sufficient to establish undue influence. There must in addition be proof that the one occupying such relationship displayed activity in the preparation of the will to his undue profit. (*Estate of Relph,* 192 Cal. 457, 465 [221 Pac. 361]; *Estate of Lavinburg,* 161 Cal. 536, 543 [119 Pac. 915]; *Estate of Ricks,* 160 Cal. 450, 461 [117 Pac. 532]; *Estate of Morcel,* 162 Cal. 188, 196 [121 Pac. 733].) No such activity on the part of Thomas Presho as to the execution of the will is here shown. The evidence offered on behalf of the contestant was therefore wholly insufficient to support a finding that such undue influence was exercised by Thomas over the deceased at the time the will was executed on May 5, 1921, as to destroy the free agency of the deceased and overcome his volition at that time. (*Estate of Relph, supra; Estate of Kilborn,* 162 Cal. 4 [120 Pac. 762]; *Estate of Baird,* 176 Cal. 384 [168 Pac. 561].)

[9] The respondent also relies on the foregoing evidence in support of her contention that the will was procured as a result of fraud practiced on the deceased by his brother Thomas. It is insisted that Thomas continually charged the respondent with "doping" her husband; that this charge was repeatedly made in the presence of the deceased, was untrue, was known by Thomas to have been untrue, and was believed by the deceased. But the will was not unfair to the respondent and it cannot be said that the statement so credited to Thomas was reflected in the provisions of the will to her detriment (*Estate of Shay, ante,* p. 355 [237 Pac. 1079]). Excluding all consideration of the evidence in support of the proponents of the will, it must be concluded that the

evidence on behalf of the contestant as to any of the grounds of contest concerning the proposed will was not inconsistent with the claim that the will was the spontaneous act of the decedent. It was fair to the contestant, who concedes that under it she would receive "something in excess of the share that she would have received if the deceased had died intestate." Furthermore, it was not an unnatural will so far as Thomas Presho was concerned, taking into consideration the long and intimate business relationship and admitted affection between the brothers. The evidence adduced on behalf of the contestant, taken as a whole, was entirely insufficient to support the findings of the jury on those issues. The motion for a nonsuit should therefore have been granted.

As to the special issues concerning the alleged invalidity of the codicil, the respondent, in support of her contention of want of mental capacity, testified: "About the 23d or 24th of March, 1922, Thomas Presho took my husband on the street car, and I met them as they were coming home, on the home corner where he had been associated with the surroundings for thirty-five years, and on the east side of his own home corner, and he stopped and my husband said, 'Where are we? I don't know where we are; where are we, we are on the wrong street, aren't we?' And he was looking at his own home at that time. This was about the 23d or 24th of March, 1922. If this codicil is dated March 31, 1922, it was about a week before the codicil was signed; and then I had always tasted his food; I would take two tablespoonfuls of all his food to get him over that notion that he was being poisoned, and to show Mr. Tom Presho that the food was all right, and for his protection too, and I would always take it, part of it, and taste it, but then Matthew had no memory and he would not remember, and the next day it would be the same thing all over again, that I had doped him. This condition of forgetfulness got constantly worse." This incident, when considered with other evidence in the case, merely establishes that the deceased was suffering momentary confusion. [10] Such a condition may be accounted for by his age and general physical debility, and is entirely insufficient to overthrow the presumption of sanity existing in favor of the testator at the time of the execution of the codicil. The infirmities of age and lapse of memory

are not sufficient in themselves to establish lack of testamentary capacity (*Estate of Dolbeer, supra; Estate of Purcell, supra; Estate of MacCrellish,* 167 Cal. 711 [L. R. A. 1915A, 443, 141 Pac. 257]). [11] Nor was the evidence sufficient to justify the special finding of the jury that the codicil was the product of fraud practiced upon the deceased by Thomas Presho. [12] But on the special issue of undue influence as to the codicil there was evidence from which reasonable inferences might be drawn that the execution thereof was the result of influence in its procurement directly brought to bear upon the deceased by Thomas Presho. This evidence is found in part in the testimony of the contestant as to what took place on the day the codicil was signed by the deceased, and is as follows: "Q. I call your attention to March 31, 1922, the date of this codicil, and I will ask you what happened on that day between Thomas Presho, your husband Matthew, and yourself? A. The back porch of my home has a sunny exposure, and I had been doing my work, and they, my husband and Tom Presho, did not know I was anywhere around. Tom and my husband were sitting on the back porch, and I heard Tom Presho say to Matthew, 'It is all right Matthew; it is all right Matthew; remember Matthew, remember Matthew, I am your brother; Judge Gosbey will believe me, but he won't believe her,' and he emphasized 'her.' So I knew there was something wrong. This was in the morning. So then I don't remember just when it was, but following that I saw my husband with some papers, I think it was the same day; and following that I went out and got in the automobile, the automobile was out in front of the house, and I got in the automobile and Tom Presho spoke up and said, 'Get out of this automobile.' And I just sat there, because I made up my mind I was going to see where they were going and what they were going to do, and so when I did not get out Tom Presho said, 'Well, I will railroad her down to the jail.' My husband had got out of the automobile, so I thought my husband had gone into the house, and I got out to look for him, and anyway they gave me the slip and went off together. They left in the automobile. I don't remember whether it was in the morning or afternoon, but I think it was in the afternoon. I heard that statement about Judge Gosbey in the morning, very plainly, when they were on the porch,

and I was doing my work around the adjoining part of the house. My husband and Thomas went away in the machine, and they returned about 4 or 5 o'clock in the afternoon. My husband came in and Tom had made him so angry with me, as he always did when he had him alone, and he said, 'You were well fixed, Laura, but now you will have enough to eat as long as I live.' And Tom said, 'Well, there will be weeping of tears and gnashing of teeth, but it's right, it's right.' My husband was present when that was said. Tom repeated, 'It's right, it's right.' My husband was kept in that angry state; he was sick, and he was kept in that angry state all the time by Tom Presho. Neither my husband nor Tom Presho said what they referred to when they made these statements. I first knew of the existence of this codicil after my husband passed away. I had never seen it before that time. I was never told by my husband that it was in existence."

The foregoing evidence was undoubtedly believed by the jury to be true. From such evidence it may fairly be said that the jury might properly and reasonably infer that on the occasion referred to Thomas had in mind a proposed codicil; that he was importuning the deceased to make the same; that if such codicil were offered for probate the evidence of himself, Thomas, would be believed and that of the wife would be disregarded; that Thomas, in accordance with his plan to procure a change in the will to his advantage and to the prejudice of the wife, concealed from the latter his purpose and so dominated the will of the deceased as to make the codicil a product of his own desires and not the free and voluntary act of the deceased. [13] Evidence that pressure was on that day brought to bear on the testamentary act need not be direct. Circumstantial evidence is sufficient. (*In re McDevitt, supra; Estate of Anderson, supra.*) In addition to the testimony of the contestant Thomas Presho testified that on the day the codicil was signed there was a conversation between Matthew and himself concerning a change in the will; that he took Matthew to an attorney's office and was present when the codicil was dictated, at which time Matthew told the attorney that he desired to change the provisions of his will regarding his wife, from a direct devise to a life estate. The testimony of the contestant as to what had taken place at the home on

the day of and prior to the signing of the codicil and the testimony of Thomas as to what took place immediately thereafter were sufficient upon which to base the conclusion that the subject matter in the minds of Matthew and Thomas during the controversy related by the wife was a change in the will and that the activity of Thomas on that day had the direct result of a modification in the will to his advantage.

Numerous objections to rulings of the trial court on the admission of evidence have been noted. In view of the conclusions above expressed none of them is of sufficient importance to require discussion.

The judgment refusing to admit to probate the proposed will of May 5, 1921, is reversed, and the judgment refusing to admit to probate the proposed codicil of March 31, 1922, is affirmed.

Lennon, J., Lawlor, J., Richards, J., Myers, C. J., and Seawell, J., concurred.