A petition for a rehearing was denied April 13, 1944.

[Civ. No. 14082. Second Dist., Div. Three. Mar. 21, 1944.]

Estate of GEORGE KING, Deceased. GLADYS G. KING, Appellant, v. GRIFFIN WALTER WILSON, Respondent.

Gladys G. King, in pro. per., Rosalind Goodrich Bates, Glenn A. Lane, Monta W. Shirley and Edwin H. Casey for Appellant.

Walter G. Danielson and Irsfeld & Irsfeld for Respondent.

DESMOND, P. J.—This is an appeal by contestant, Gladys C. King, widow of George W. King, sometimes known as Henry H. King, from a judgment of nonsuit and an order admitting to probate his will and two codicils and appointing as executor without bond, proponent Griffin Walter Wilson, nominated as such by decedent in said will.

By the terms of this instrument, which he signed on November 5, 1928, Mr. King devised and bequeathed "all the rest, residue, and remainder of my estate, both real and personal of whatsoever kind or character and wheresoever situated, to my friends and benefactors, Griffin Walter Wilson and his

wife, Pearl E. Wilson, . . . share and share alike, or to the survivor of them." A codicil was executed on August 8, 1934, by which Mr. King left his foster daughter the sum of $1.00 and otherwise ratified and confirmed the will of 1928. A second codicil was executed on November 28, 1938; this codicil, as well as the will and the first codicil, being signed "Henry H. King," a name under which the testator was known in the neighborhood where he lived. By its terms, this second codicil referred to the will of 1928 and the codicil of August 8, 1934, ratifying and confirming them "in all respects save in so far as any part thereof shall be revoked or altered by this present Codicil. I hereby declare that since the making of my Will and first Codicil, to-wit, on the 19th day of September, 1938, I married at Reno, Nevada, and that my wife's name is Gladys King. I am making no provision in said Will for my said wife for the reason that I am transferring to her name and mine, in joint tenancy the following described property: The northeast ninety feet (90') of Lot Eleven (11), Tract Fifty-Eight Hundred and Thirty (5830), City of San Fernando, County of Los Angeles, State of California, as per map thereof recorded in the County Recorder's office, said Los Angeles County."

The widow, by her contest, alleged that the will and codicils should be denied probate on various grounds: First, defects in execution as follows: (a) that the instruments in question were not subscribed by the decedent; (b) that he could neither read nor write except for the writing of his name and certain simple words which he had learned, and that he did not know the contents of the codicils or publish or acknowledge them in the presence of witnesses; (c) that he did not sign his will in the presence of alleged witnesses or acknowledge to them that the signature to the will was his or that it was made by his authority; (d) that said witnesses did not sign the will in the presence of the decedent or in the presence of each other; second, that the signature of the decedent to the purported will and to the last codicil "if the same was signed by decedent" was procured by undue influence and fraudulent representations made by Wilson; third, that the decedent was not of sound and disposing mind at the time he executed the first and second codicils but "on the contrary, he was . . . at the point of dissolution and in such extreme condition of mental and physical weakness that he was not capable of making or undertaking to make a will or codicil to will."

The contestant prayed that the "said will and each of the purported codicils thereto and, in particular, the purported last codicil thereto, be denied probate," and that letters of administration be issued to her.

When the case was called, the court excused the jury before any evidence was taken and then proceeded to hear the preliminary proof as to the validity and proper execution of the three documents and, finding that a prima facie showing had been made, thereupon recalled the jury for the purpose of hearing evidence upon the contest. At the conclusion of contestant's case, upon motion of counsel for the respondent, a nonsuit was granted upon each and all of the alleged grounds of contest, the court finding "that no substantial evidence or any evidence had been introduced by the contestant upon any of the alleged grounds of contest in her amended contest of probate of will." The court ordered that all three of the instruments offered be admitted to probate.

Appellant in her opening brief states that "in the trial court appellant contended (1) that the testator was acting under undue influence at the time of the execution of the will and codicils thereto, and (2) that at the aforesaid times the testator was mentally incompetent to dispose of his estate by will. Henceforth appellant's attack will be concentrated upon ground (1) above, to-wit, undue influence." No serious contention is made that the testator was mentally incompetent at any time or that there was any defect in the execution of his will or codicils. The entire argument is devoted to an effort to prove that he was acting under undue influence when he undertook to dispose of his estate. There is no specification in the amended contest, upon which this case went to trial, of any undue influence exerted upon the testator in connection with the execution of his will and first codicil, all the allegations concerning undue influence being contained in the second ground of contest and confined to the activities of the proponent and his son-in-law and agent, Joseph E. Brewer, at or about the time the second codicil was executed. These allegations charged "that almost immediately after the marriage of the said Contestant to the said decedent, GRIFFIN WALTER WILSON and his son-in-law, JOSEPH E. BREWER, commenced to poison and prejudice the mind of decedent against Contestant, telling him that Contestant married the decedent for his money and property only, and that Contestant was only interested in his money and not in

decedent.'' It was further charged that the proponent stated to Mr. King that the appellant herein was not trying to be a true wife to him, was not making a home for him, was not caring for him as she should have done, and otherwise criticized her so that decedent's mind was further poisoned against her; that Wilson and Brewer urged Mr. King to protect himself from the appellant and ''by exerting their influence upon him and imposing upon his confidence and trust in them, otherwise caused the said decedent to become changed toward your Contestant, so that his feeling of affection and regard were changed into feelings of dislike, disfavor and aversion.'' It was also charged in the amended contest that except for the statements made by Wilson and his son-in-law and their influence upon the decedent, and except for the fact that they were both his constant companions and that Mr. King had absolute confidence in everything they said and in their statements made against appellant, each and all of which were false, ''the relationship between your Contestant and said decedent would have been harmonious, and said decedent would have provided by will for your Contestant herein, in accordance with his original statements and representations to your Contestant.'' The contestant finally charged that the last codicil would not have been executed by the decedent except for the false statements and representations made by Wilson and Brewer at the time of its execution, but that he would have made provision for her in accordance with the statements and promises made to her at the time of her marriage.

In his answer, the proponent Wilson, whose wife had passed away, denied all the above mentioned allegations but admitted the truth of certain other allegations in the following language, ''proponent admits that decedent had known proponent for many years, to-wit, about forty years, and that decedent's relations with proponent had been of a very friendly nature, and that decedent had worked for proponent, and that said parties had been in business together and that decedent placed great reliance upon the statements, representations and wishes of proponent. Proponent also admits that contestant was married to said decedent in September, 1938, and that at that time decedent was 85 years of age and contestant was 34 years of age.''

The evidence showed that the date of the marriage was September 19, 1938, approximately 10 years later than the

date of Mr. King's original will, and the record discloses that he had never known the contestant until approximately six months prior to the execution of his last codicil. Her first meeting with Mr. Brewer followed shortly thereafter when Mr. King introduced him to her. The proponent Wilson never met her until after her marriage, when she was introduced to him by her husband. It is apparent, therefore, that no undue influence adverse to this appellant was exerted upon Mr. King's mind when his will was executed; the same is true of the codicil executed on August 8, 1934, approximately six years later. The court's consideration of the charge of undue influence exerted by Mr. Wilson and Mr. Brewer, therefore, was limited to the second codicil, which, it will be noted, not only bequeathed the parcel, above mentioned, in joint tenancy, but ratified and confirmed the will of 1928 and codicil of 1934 "in all respects save in so far as any part thereof shall be revoked or altered by this present Codicil."

Section 70 of the Probate Code provides that "If a person marries after making a will, and the spouse survives the maker, the will is revoked as to the spouse, unless provision has been made for the spouse by marriage contract, or unless the spouse is provided for in the will, or in such way mentioned therein as to show an intention not to make such provision; and no other evidence to rebut the presumption of revocation can be received." The second codicil which we are considering, states in definite terms "I am making no provision in said Will for my said wife" and then gives as the reason "that I am transferring to her name and mine, in joint tenancy the following described property:" etc. He carried this intention into effect when, on the 28th day of December, 1938, he executed a grant deed conveying to himself and his wife, as joint tenants, the real property mentioned in the codicil. On July 31, 1939, the decedent passed the entire title in said parcel to his wife by executing a deed in her favor, reciting that "THIS DEED is given to carry out the mutual agreement of the parties hereto: That said property shall become vested in the Grantee as her sole and separate property free from all interest, title or claim of the Grantor now existing, or which may hereafter arise by reason of the marital relations of said parties, and is so accepted by said Grantee, whose signature is subscribed in confirmation thereof." Approximately one month earlier, on June 30, 1939, Mrs. King had conveyed to her husband whatever in-

terest she had in "Lot 10, Tract 9402 as per map recorded in Book 129, page 99 of Maps, in the office of the Recorder of said County." This parcel is located in the Town of Newhall, and the deed signed by Mrs. King contained the identical language just quoted from the deed of Mr. King, dated July 31, 1939, passing the San Fernando property to her.

The appellant argues that the evidence which she produced at the hearing was sufficient to place upon proponent the burden of showing that the will (presumably meaning the second codicil) was not induced by his undue influence. In answer to this, the respondent asserts that under the rule as it is mentioned in many of our California cases, including *Estate of Higgins* (1909), 156 Cal. 257, 261, 262 [104 P. 6]; *Estate of Baird* (1917), 176 Cal. 381, 384 [168 P. 561]; *Estate of Relph* (1923), 192 Cal. 451, 465 [221 P. 361], such burden would fall upon him only if the evidence showed that while holding a confidential relationship toward the decedent, he participated actively in procuring the execution of a testamentary instrument providing undue profit for him. He does not concede that a confidential relationship existed between himself and Mr. King, and denies that he participated actively in procuring the execution of the will or either of the two codicils. He also denies that he profited unduly by the will or codicils.

It is our opinion that he held a confidential relationship toward Mr. King over a long period of years and up to the time of his death. It appears from the evidence that he first met Mr. King 35 or 40 years ago when he hired him as a carpenter; that at a later date, approximately 1923, when King was over 70 years of age, he returned to California from a trip to some other part of the country and stayed in the Wilson home as a guest of Mr. and Mrs. Wilson for several weeks, during which time he tried unsuccessfully to get a job. Mr. King was then an old man and some of his fingers were missing. Referring to the transcript, we find the following testimony of Mr. Wilson, called under section 2055, Code Civ. Proc.: "I started him in the building business, agreed to take care of him, look after him in business affairs, take care of him in sickness and in health, and to see that he had a good, Christian burial, and I bought the lot he wanted I should buy, and buried him there. I did not consult his wife because I had that agreement with him, with the pledge exacted from me, that I would attend to this. It was stated

that I was an old friend of Mr. King, and that is true; that Mr. King had the utmost confidence in me, and that is true; and I am proud to have it brought up by the opposing attorney that such is the case. Now, the agreement was expressed by Mr. King on his own account that whatever he had should be mine and my wife's. He had often told my wife he loved her, that she had been a mother to him for a long time. He was a man who appreciated courtesy and care; and he was a man that I held in the highest esteem; and, so, the agreement was that whatever Mr. King could make out of the building business, he would deed the property to me. Mr. King lived up to that part of the agreement. He deeded these properties to me, because we considered it was a good plan to keep them and get an income from them; one of them was to be a home. I kept my part of the agreement with Mr. King by doing as I agreed . . . The agreement was that when we went into business that whatever could be made out of that, after caring for Mr. King through life, he had so much a month, whatever he needed; and the will was made in case there should be some piece of property that was in his name and not in mine, that it should go to me and my wife. Q. In other words, to carry out the original plan so that he would be leaving you all of this property—that was the effect of it? A. That's right. . . . Any time Mr. King wanted extra money, he would come to me and I would just hand it to him. Q. He always paid it back? A. He did. He didn't owe me a cent when he died. Q. So that this money which came from the properties you did not consider as an advance by you to Mr. King, did you? A. No, Mr. King did not claim ownership; that which came from the property which was deeded to me, it went into a fund. Q. And out of this fund you advanced the money for him to live on? A. I did.'' Other testimony showed that proponent's son-in-law, Mr. Brewer, acted as his agent ''with reference to taking care of Mr. King''; that this was pursuant to an agreement which he had with Mr. King. Additional excerpts from the testimony might be quoted, but we feel that the foregoing sufficiently shows that a confidential relation existed between the proponent and Mr. King.

■ We pass now to a consideration of the second point urged by the appellant and denied by the respondent, namely that the will and the second codicil were procured by active participation of the beneficiary. To prove such participation,

the appellant reviews some of the incidents occurring when these instruments were executed, omitting any reference to the first codicil of the 8th day of August, 1934. That particular document, according to the testimony, was prepared by an attorney of San Fernando at the instance of Mr. King himself, who was not accompanied by anyone so far as the attorney could recall. It was witnessed by the attorney and a bank officer.

As to the will, appellant notes that Brewer, Wilson's son-in-law, was one of the witnesses and calls attention to the fact that the attorney who prepared that will and also witnessed it, Mr. Douglas Fawcett, had offices with Mr. Irsfeld, who, on a prior occasion, had acted for Mr. Wilson in regard to some minor legal matters. It appeared from Wilson's testimony that on that occasion he took Mr. King to Mr. Irsfeld's office upon learning that he wanted to draw a will. It does not appear that on that occasion Wilson was present at any discussion concerning the terms of the will.

As to the second codicil, the testimony was to the effect that King told Wilson that he wished to draw a codicil and that Wilson then "accompanied" him to Mr. Irsfeld's office. What became of Wilson after he arrived with King at the Irsfeld office does not appear, but there is no testimony that he was present when the terms of the codicil were discussed or that he had any knowledge of its terms. Mr. James B. Irsfeld, Jr. witnessed the execution of the codicil and testified, "My father read the original will and this codicil to Mr. King, and asked him if that was his intention, to execute this codicil to that will, and he said it was." Miss Jean Gordon, the other witness to the codicil, was asked, "Was Mr. Wilson present?" and answered, "No, Mr. Wilson was not even in the office that day at all. Q. And did you hear this will read to Mr. King? A. Mr. Irsfeld, Sr. read it to him." Appellant, in her brief, states "We have already seen that Mr. Wilson did not permit Mrs. King to accompany Mr. King at the drawing of the codicil, stating 'No, where we are going we do not want women along.'" We believe she is mistaken in applying that remark to the occasion when the second codicil was executed. According to the record, Mr. Brewer had left a note, dated "Sunday," for Mr. King to "Come over Monday morning 9 or 10 o'clock regarding refund on tax bill. Has to be signed before a notary. Joe",

and it was then, upon leaving the house, that Wilson made the remark quoted. We notice that the date when the second codicil was executed, November 28, 1938, also fell upon a Monday, but it would be mere conjecture to assume that when the three men left for the ostensible purpose of securing a tax refund they had in mind the execution of the codicil or that the codicil was executed on that day.

We find nothing in this record to indicate that either Wilson or Brewer participated actively in procuring the execution of the will or the second codicil. It seems appropriate, since in this case the court granted a nonsuit on the issue of undue influence, to quote the language of the Supreme Court in another case upholding similar action. In the *Estate of Arnold* (1940), 16 Cal.2d 573, 581 [107 P.2d 25], it is said: ''Conceding, simply for the purpose of argument, that a confidential relation was proved to have existed between Mrs. Logan and Arnold, proof of that fact alone did not cast the burden of proof upon her that the will was not obtained by her through undue influence. (*Estate of Purcell,* 164 Cal. 300, 303 [128 P. 932].) In that case it was held that proof of a confidential relationship did not bring into play a presumption of undue influence in the absence of evidence that the beneficiary suggested the terms of the will. In the *Estate of Baird,* 176 Cal. 381, 384 [168 P. 561], we find the applicable rule stated in the following concise language: 'As suggested in *The Estate of Higgins,* 156 Cal. [257] 261, [104 P. [6]8], a ''presumption of undue influence'' arises from proof of the exercise [existence] of a confidential relation between the testator and such beneficiary, ''*coupled with activity on the part of the latter in the preparation of the will.*'' The confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of the will.'

''In an unbroken line of decisions of this court, the above statement of law has been approved. (*Estate of Anderson,* 185 Cal. 700, 716 [198 P. 407]; *Estate of Ricks,* 160 Cal. 450, 461 [117 P. 532]; *Estate of Relph,* 192 Cal. 451, 465 [221 P. 361]; *Estate of Lances,* 216 Cal. 397 [14 P.2d 768]; *Estate of Lavinburg,* 161 Cal. 536, 540 [119 P. 915]; *Estate of Presho,* 196 Cal. 639, 651 [238 P. 944]. See, also, 28 R.C.L. 146.)

''As the evidence of contestant failed to show any activity

on the part of Mrs. Logan in the procurement of the will of decedent, it was inadequate to prove undue influence on her part in the execution of said will. The evidence being insufficient to show that the will of said decedent was the result of the undue influence of either of the proponents, the court properly granted the motion of respondents for a nonsuit.''

Since the evidence in the instant case disclosed no activity on the part of the beneficiary or his agent in the preparation of the will, there is lacking one of the essential elements tending to cast upon the beneficiary the burden of proving that no undue influence was exerted upon the mind of Mr. King at the time he executed the second codicil. ▮ That being so, we are called upon to consider whether, on the plaintiff's presentation of the case, there was any evidence which warranted the submission of the case to the jury. In the *Estate of Arnold, supra,* the court quotes, at page 576 from an opinion written by the late Mr. Justice Langdon in the *Estate of Flood,* 217 Cal. 763, 768 [21 P.2d 579], as follows: '' 'It has become the established law of this State that the power of the Court to direct a verdict is absolutely the same as the power of the Court to grant a nonsuit. A nonsuit or a directed verdict may be granted ''only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of plaintiff if such a verdict were given''.' '' In the light of this rule, we have considered the multitude of details appearing in the transcript upon which appellant bases her claim that at the time the second codicil was executed, Mr. King was so unduly influenced as to prevent him from making provision for her ''in accordance with the statements and promises made to her at the time of her marriage.'' The contestant's recital regarding these promises is vague, as will be seen from the following: ''Q. Now, during this period of time that you have described [a few weeks prior to the marriage], did you ever discuss with Mr. King anything about his property or what he intended to do with his property? . . . A. . . . in my first talk with Mr. King . . . Mr. King went on to tell me that day that he had these

properties that he could give to anyone; and that is why I happened to suggest that he try to find some widow with a child or someone that could be really helpful; and he said he had these properties he could give to anyone; and, as I remember, we waited a certain length of time for Elsie to come home, and when she did not and I would have to go in a few minutes, and I said, 'How about seeing that house today that you are building?' He said, 'Sure, go ahead, let's do it,' and he put on his hat and we got in my car and went up and looked at that house. Then, on the way up, we passed some of the houses he built, and he started pointing them out to me, and then he had me drive around and showed to me other houses he built, but I didn't pay so much attention to them at that time; but he showed me the ones he had and the ones that were paying off mortgages and the ones that were just rented. Q. Did he make any statement to you as to the title to any of those houses? A. He said the 'Hollywood folks,' he called them his 'people at Hollywood,' that they were no relations but that they were taking care of the funds from these houses that were paying off on the mortgages; and in case anything should come up he would have more than the usual allotment, that that was their understanding, that they were to give it to him. Q. Now, after these occasions that you have told us about did you ever discuss with Mr. King anything about how he would leave the property? A. Well, he told me, of course, that if I could come and be his housekeeper—— Q. Tell us when this conversation you are about to relate took place. A. Well, he said that day if I did come and be his housekeeper that that would be what he could do for me and he had made that proposition to several other people, but that he had not been able to work out anything that would be satisfactory both to him and them; and so often it would be someone that could not drive a car, and so on. Q. Then, on any other occasion did you have a talk with him about how he would leave the property? A. Yes. Q. When? A. Well, on every occasion that I saw him before we were married, practically, and he said, 'The property I showed you and that I pointed out to you,' and 'That is what I have to offer,' and 'That is the proposition.' Then I told him I could not be his housekeeper, and then is when he said, 'I don't suppose you would consider marrying anyone like me.' Q. Now, other than the state-

ments you have told us, did he make any other statement about his property and what he would do with it after he died? A. Well, he said if he could get someone who was satisfactory to come in there and take care of him, keep his home and help him. Q. Any other conversation than that one that you recall, that differs from any you have told us about? A. He said, 'What I would like to do would be to take a trip every summer and build a house every winter'; and everything he built would go to the party that would do the things for him, if there was anyone that he could find; and that was the natural conclusion. Q. Before we leave this point I want to try to refresh your memory to see if you can recall any other conversation or anything said by Mr. King from the time you first met him until he died pertaining to the method in which he intended to dispose of the property at the time of death. A. Well, when he was angry with me, he would say he [it] was going to the 'Hollywood Folks'; and when he was angry with them he would say he wanted me to have it, or he didn't care who got it. Q. Do you recall any other things he said pertaining to how he was disposed to handle it? A. Well, he told me that they would not let him fix it up for me. Q. When did he tell you that? A. He told me that, I think it was this same occasion that they took him down the street and Mr. Brewer wrote the note—I remember he told me, on the way over there that morning—that was the first occasion we had been over there in the daytime, so that they could get into the bank and safe deposit and get the deed out for him; and he said he was going to ask them to do it; and on the way home he told me that they had put him off and told him to let everything ride, because maybe something might happen and they had to protect him, of course; and that very likely before long he would find out what the object was, or something; and so, he said, 'The only thing they let me do was to fix up the property where we are building, and to give that to you as a Christmas present.' Q. Was that about November, as well as you remember? A. Yes, as near as I can remember. It seems to me it was about the time the taxes were due, because it seems like the refund in taxes, it seems like that note came right after the taxes were due. Q. Now, you say that Mr. King told you that they said they would let him fix up the place he was building. Do you know what the address of that place was?

A. 1508 Fifth, San Fernando. Q. It is the same piece of property about which I questioned Mr. Wilson a while ago, while he was on the witness stand? A. Yes. The northeasterly ninety feet of Lot 11 of Tract 1530 (?), San Fernando—I believe I have that correct. Pardon me just a moment. What he said was that they would allow him to put that in joint tenancy immediately—they would fix it in his name and they would allow him to fix it so that it would be his and mine, but that is all they would allow him to do. Q. Well, now, you say that was about the time that the taxes were due, is that correct? A. That is what I hook it up to in my mind, associate it with, I should say.''

If the foregoing recital can be said to indicate a promise to bequeath various parcels of land to the future Mrs. King, the jury certainly had no information as to what those parcels were. There was a discussion at the trial concerning a declaration which Mr. King made on April 6, 1939, in which he stated, ''During the past fifteen years, I, HENRY H. KING, have transferred to Griffin W. Wilson, Pearl E. Wilson, his wife, and Joseph E. Brewer and Kathaleen M. Brewer, his wife, certain properties as hereinafter described. Said transfers were made for a valuable consideration and with the intention that the properties transferred should belong to the respective transferees as their own properties; the consideration for said transfers was the agreement of the transferees to look after me and see that I was well cared for as long as I lived and to bury me when I died. I have been associated with Griffin W. Wilson for over forty years; he has always, during that time, looked after me. I am making this declaration so there can never be any question as to my intention in making said transfers and in order that the ownership of the properties transferred may not be questioned by anyone who might claim through me after my death.'' Then followed a description of 5 parcels of land, located in the Town of Newhall, transferred to Joseph E. Brewer or to Joseph E. Brewer and Kathaleen M. Brewer, husband and wife; also a description of 4 parcels, transferred to Griffin W. Wilson and Pearl E. Wilson, husband and wife, as joint tenants, 3 of these parcels being located in Newhall and the other in the City of San Fernando. The last mentioned parcel consisted of the northeasterly 90 feet of Lot 11 and all of Lots 12 and 13 of Tract 5830, which it will

be noted, included the parcel conveyed in joint tenancy by Mr. King to his wife. This last mentioned lot, namely, the northeasterly 90 feet of Lot 11, Tract 5830, was conveyed to Henry H. King, a widower, by deed, dated August 19, 1938, signed by Griffin W. Wilson and Pearl E. Wilson. We may conclude from the testimony that this transfer took place during the brief courtship of Mr. and Mrs. King and, without question, was the parcel concerning which contestant testified that Mr. King said ''The only thing they let me do was to fix up the property where we are building, and to give that to you as a Christmas present.''

We are left in the dark, and so was the jury, as to whether any of the parcels mentioned in the declaration which Mr. King executed were the properties which he showed her at or about the time of their first meeting and which he said ''he could leave to anyone.'' The evidence showed that at the time Mrs. King first met King he was just completing a house at Newhall and that immediately thereafter he started building another on the lot in San Fernando which Mrs. King selected as the place where she would like to live with him.

We have quoted at length from the transcript at this point in order to point out not only that there was a discussion between Mr. King and his wife-to-be concerning property which he claimed to own, but also to show that he was not in a position, as matters then stood, to convey the real estate either by deed or by will; it had all been transferred to Brewer or Wilson in accordance with the trust agreement which had existed between them and Mr. King for a long period of years. There is no evidence in the record to indicate that the proponent ever failed, either personally or by his agent, in carrying out the terms of that trust. All the evidence is the other way. To be sure, there is some indication in the testimony which we have quoted that King had discussed with Wilson and Brewer some adjustment of their affairs, by which, possibly on an accounting, he might be recognized as possessor of one or more parcels of real estate, but such discussion if it ever took place brought no tangible results, unless the San Fernando lot may be so considered, for, according to Mrs. King, her husband told her that the only thing they would ''let me do was to fix up the property

where we are building [1508—5th Street, San Fernando], and to give that to you as a Christmas present.''

The statement of Mrs. King of her husband's vacillation between "the Hollywood folks" and herself as his beneficiaries was confirmed by a note produced by the respondent in cross-examination, which Mrs. King had written to a next door neighbor at San Fernando, where she had been living, or we might say "camping," for approximately a month and immediately following her marriage. This note reads as follows: "November 7, 1938. My dear Mrs. Charles: Don't bother to return the bread. I had a hard time getting the carpenter back on the job after you were here this morning. He was white and shaky and said every time you come onto the place he gets so nervous he can hardly work the rest of the day. He practically told me yesterday that everything is going to Brewers and Wilsons so all I'll get out of this embarrassing mess is what he can do from now on and he's promised me a home and promised to take care of me and if I get him to keep on I'll do well. Please try to understand and if he doesn't put in your walk when he finishes building on the other side of you, I'll see that you get the equivalent. Now, that's a promise in writing. He promised you that walk and he owes it to you. Like a lot of things he promises me today, and forgets tomorrow. I'm used to keeping my promises. Please try to understand, Mumsy, Gratefully, Gladys.'' While Mr. King is not mentioned personally in this note, he is referred to as the "carpenter" and at that time, certainly, he had no intention to depart from the plan which he had outlined years before, as evidenced by his will and first codicil, as well as by his working harmoniously and satisfactorily with both Brewer and Wilson for a period of approximately ten years after the will was written.

It cannot be questioned that Wilson took occasion to state his personal views on the marriage both to Mrs. King and to Mr. King. He testified, "I had a little heart to heart talk with Mrs. King, and I told her that she would find that she didn't marry an angel, she married a hard headed, hard working old Irishman, and that if she would just 'rub the fur the right way' she could get anything that was right from Uncle George; but when she crossed him and interfered with his affairs, things might not go quite as well.'' He also testified, "I don't doubt in the least at this time that I told

Mrs. King that I didn't think as fine a looking a woman as she was would marry as old a man as Mr. King because she loved him; and I am pretty sure that she admitted that my deductions were right." He further testified that at a later time he might have said to Mr. King that Mrs. King married him for his money—"It would be naturally discussed. You must remember, Mr. King and I were very close, old friends, and I was looking after his interests as best I could." According to Mrs. King, on another occasion after there had been some disagreement, "he [Wilson] remarked to Mr. King that if I [he] did not behave I would be likely to try to do something, just like poisoning his food, or something like that, and that it was up to him to protect himself against me." Whether this was said jokingly or not, Mrs. King did not know. It also appears that King came to Wilson and told him that he wanted to get a divorce from Mrs. King and wanted to know what he should do. "I told him I never tried it, and the only way he could find out was to go to one that was qualified to answer the question, which would be an attorney. Q. Did you take him to an attorney? A. At his request; he probably said, 'Where will we go to, Jim?' Q. Then you went to Mr. Irsfeld regarding a divorce? A. Yes. Q. Do you know whether a complaint of divorce was drawn? A. The preliminary proceedings were taken; and Mr. King wanted to know what it was going to cost him, and if it had to be contested, it would be $400. Mr. King came back the next morning to say he would fight it out to the bitter end, but he would not pay $400 to get a divorce, if she wanted one let her get it. That stopped the proceedings." Mrs. King also testified that at some later time Wilson suggested to her that she might obtain an annulment from Mr. King.

It is contended that these and similar incidents, some of which occurred long after the testamentary act of November 28, 1938, make a case precluding the court from ordering a nonsuit, having in mind the conditions under which such action might be taken as stated in the *Estate of Flood, supra,* 217 Cal. 763, but we have in mind the following: "In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of*

*Motz,* 136 Cal. 558, 583 [69 P. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. *(In re McDevitt,* 95 Cal. 17, 33 [30 P. 101].) . . . 'The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made".' *(Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872].)'' *(Estate of Arnold* (1940), 16 Cal.2d 573, 577 [107 P.2d 25].)

*In re Kaufman* (1897), 117 Cal. 288, 295 [49 P. 192, 59 Am.St.Rep. 179], quotes the court as saying in *Eckert* v. *Flowery,* 43 Pa.St. 46, " 'Unless there was some evidence tending legitimately to prove that some fraud had been practiced upon the testatrix at that time, or that some misrepresentation had then been made, or that some physical or moral coercion had been employed, such as to destroy her free agency, the court erred in submitting to the jury the question whether undue influence had been exerted. It was inviting them to find as a fact that of which there was no evidence, and which the law as well as reason presumed had no existence.' '' No such error could be charged to the trial judge in the instant case, for he was governed by the principle expressed in the following language: ''Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to *coercion* destroying free agency on the part of the testator. *(Estate of Keegan,* 139 Cal. 123, 127 [72 P. 828].) It is further held that mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. *(Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614].)'' *(Estate of Arnold* (1940), 16 Cal.2d 573, 577 [107 P.2d 25].)

The comment of the court on the claimed undue influence, consisting of the alleged domination and control of beneficiaries under the will of Mrs. Purcell, in the *Estate of Purcell* (1912), 164 Cal. 300, 302 [128 P. 932], is pertinent in our consideration of the present case. ''The most that can be said of the evidence on this branch of the case is that it shows that they had the opportunity to exercise undue influ-

ence upon her in the matter of the making of this will and might have done so if they had been so disposed and had possessed such influence. This, however, is not sufficient. The undue influence must actually exist, it must be actually exerted and it must be so exerted as to affect the terms of the will. There is no substantial evidence of either of these conditions. The fact that the confidential relation of principal and agent existed between the testatrix and Purcell does not in itself prove that the will was procured by undue influence arising from that relation, nor cast upon him the burden of proving the absence of such influence at the time of its execution. [Citing cases.] There is no evidence that either of them suggested to her any of the provisions contained in the will.''

It is also proper, in closing, to consider the comment in 26 Cal.Jur. at page 646, '' 'What would be an undue influence on one man would be no influence at all on another. A man of strong will, whose mind is in its wonted vigor, could not be shown to have been influenced by what might be such influence as to wholly invalidate the will of one whose mind has been weakened by sickness, dissipation or age.' 'It is no easy thing to overpower the mind of a normal person in full possession of his senses by the mere pressure of importunities and entreaties.' '' The evidence in this case shows that Mr. King, while advanced in years, was still possessed of physical and mental vigor and that he was a man of determined purpose, fixed intention, and strong will. Appellant had reason to recognize these characteristics in him before she married him. While they were on their way to Reno, where they had planned to be married, they undertook to drive around Lake Tahoe. As night approached, Mr. King asked the appellant, who was driving, to turn around and drive back to their afternoon starting point. She declined to do so and tried to persuade him to her view that the distance completing the circuit of the lake was practically as short as required to retrace their route. Her arguments had so little effect that Mr. King stepped out of the car, left her sitting in the automobile and made his way back by foot or hitch hiking to the starting point. The proposed marriage was temporarily abandoned, but during the following day their differences were made up. They proceeded to Reno and were married. One cannot read the record without concluding that decedent was not a man easily influenced or swayed from what he set out to do.

The court, in its ruling, may have had in mind also the fact that "If the provisions of a previously executed writing are harmonious or consistent with those of the propounded instrument, the circumstance tends to rebut the allegation of imposition or undue influence. If the decedent is shown to have executed the earlier writing voluntarily, the implication is that the later instrument was not procured by imposition or undue influence." (26 Cal.Jur. 657.)

Judgment and order affirmed.

Shinn, J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied April 18, 1944, and appellant's petition for a hearing by the Supreme Court was denied May 18, 1944.